[Crim. No. 945. Second Appellate District, Division One.—October 4, 1923.]

## THE PEOPLE, Respondent, v. JAMES WHEATON et al., Appellants.

**[1]** CRIMINAL LAW—MURDER OF POLICEMEN—EVIDENCE—CONFESSIONS —APPEAL.—In this prosecution for the murder of two police officers, the evidence was sufficient to support the ruling of the trial court in admitting the confessions of each of the defendants in evidence, and as this question was one primarily for the consideration of the trial court, its conclusion will not be disturbed on appeal when substantial support therefor is found in the evidence.

**[2]** ID. — CONSPIRACY — LIABILITY OF PARTIES. — In such prosecution, where the evidence showed that on the night of the murder there was a thorough understanding among the defendants and three others to commit the crime of robbery or burglary, or both such crimes, and if detected by the officers to resist arrest, even at the risk of taking the lives of those who should attempt to arrest them, all who participated in any such understanding or conspiracy were equally guilty of any crime which was the natural

---

2. Homicide in carrying out unlawful conspiracy, note, 68 L. R. A. 193.

Criminal responsibility of one assisting in burglary during which his companion commits murder, note, 6 L. R. A. (N. S.) 1154; robbery, note, 45 L. R. A. (N. S.) 55.

and probable consequence of such an enterprise, whether he personally committed the act or whether its commission was done by any one of his associates in carrying out the common purpose.

[3] ID. — VERDICT — EVIDENCE.—In such prosecution, although the defendants did not actually participate in the shooting of either of the two policemen, the evidence was sufficient to sustain the verdict of guilty where it showed that defendants, with three others, were jointly engaged in an expedition of crime.

[4] ID.—PREVIOUS ROBBERY — EVIDENCE — IMPEACHMENT—MOTIVE.—In such prosecution, evidence of a robbery, which occurred three days previous to the killing of the police officers, of a poker game, and of the defendants' participation in the robbery, was admissible for the purpose of impeaching the testimony of defendants and others to the effect that the defendants were elsewhere on the night of such robbery, and also for the purpose of tending to show a motive on the part of the defendants for the homicide of the two policemen; and the fact that this evidence tended to show guilt of an offense other than that set out in the indictment did not render it inadmissible.

[5] ID.—EVIDENCE—USE OF ASSUMED NAME.—In such prosecution, evidence that one of the defendants and his wife went under an assumed name between the time of the murder and the time of the former's arrest was admissible as tending to show that said defendant was endeavoring to conceal his identity after the commission of the crime.

[6] ID.—EXCUSAL OF JUROR—EVIDENCE—APPEAL.—In such prosecution the ruling of the trial court in excusing a juror for the reason that she was opposed to the infliction of the death penalty as a punishment for crime is conclusive upon appeal, where the juror, in her evidence as to her qualifications to serve on the jury, gave contradictory answers to questions propounded to her respecting her opinions regarding the infliction of the death penalty; and where the jury in their verdict fixed the punishment of the defendants by imprisonment for life, the question as to the state of mind of the jurors upon the infliction of the death penalty became immaterial.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Pat R. Parker, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Fred H. Thompson, C. W. Mauk and Chas. I. Rosin for Appellants.

U. S. Webb, Attorney-General, Erwin W. Widney, Deputy Attorney-General, Thomas Lee Woolwine, District Attorney, and William Clark, Deputy District Attorney, for Respondent.

CURTIS, J.—The appellants, James Wheaton and Calvin Rowell, together with William A. Bringhurst, Willard Thompson, and Jess Wendell, were indicted by the grand jury of the county of Los Angeles for the crime of murder, alleged to have been committed on the sixth day of December, 1921. Upon motion of appellants, the court ordered that Wheaton and Rowell be tried separately from their co-defendants Bringhurst and Thompson. Wendell was never arrested. The jury found appellants guilty of murder in the first degree and fixed their punishment at imprisonment in the state's prison for life. Prior to judgment appellants made a motion for a new trial, which was denied. This appeal is from the judgment of conviction and from the order denying appellants' motion for a new trial.

The indictment was in two counts and charged the five defendants with the murder of Harry Clester in one count and with the murder of W. L. Brett in the other. The deceased were policemen of the city of Los Angeles and were on duty at the time of their deaths.

The defendant Rowell on the afternoon of December 6, 1921, met defendant Jess Wendell at Hermosa Beach, where they were both residing at the time. Rowell was driving a Ford touring car and the two rode in said car from Hermosa Beach to the city of Los Angeles. Somewhere in the vicinity of Eighth and Flower Streets, in the last-named city, they met defendants James Wheaton, William A. Bringhurst, and Willard Thompson. Just prior to this meeting Wheaton had met Bringhurst at the corner of Seventh and Flower Streets, and the latter proposed to Wheaton that they two go to Hollywood, and they were on their way to take a car to Hollywood when they met Rowell and Wendell in the former's Ford machine. In the meantime Thompson had joined the party. When they met Rowell and Wendell, Wheaton, Bringhurst, and Thompson got into Rowell's car, saying that they had a diamond job on in Hollywood, and that they would give Rowell a "cut in the deal" for taking them out there. Rowell drove the five men, including him-

self, to Hollywood. They looked the place over at Hollywood and concluded that they would not attempt to carry out their plans to rob the same, and started to return home. On their way back to Los Angeles either Thompson or Bringhurst suggested that they go and look over a hardware store on Stephenson Avenue, with the purpose of robbing it. Whichever of the defendants made the suggestion, remarked, "For Christ's sake, let's get something over there as I am broke and my wife is working and my little children have nothing for Xmas." "We can probably get some guns which Jim can sell as he is a good salesman." They drove over on to Stephenson Avenue, stopped the car in front of a hardware store and Bringhurst and Thompson got out of the car and went around to the rear of the store building. The two then returned to the car and said the job was easy— if they only had a screw-driver or something they could get in the back window. A man came out on the porch of a house on the opposite side of the street and Rowell suggested that they had better get out of there before they all got "pinched." Thompson spoke up and said, "We can't afford to go to the can. If officers should arrest us we will stick them up, tie them and leave them." They then started up Stephenson Avenue, and after they had gone about three blocks they came to a furniture store and Wendell suggested that they stop and look it over and that there were a lot of good rugs in the store. Rowell replied that he could not make a truck out of his car and that he was going home. At this juncture Thompson said, "Holy gee, the law is after us." Rowell replied, "I'll turn here and see if it is the law." He turned on to Lovena Avenue and started north, when two officers drove up in a Ford touring car and told them to stop and that they were officers. After a short conversation between the occupants of the car and the officers, during which the officers asked the men in the car where they were going and also asked to see Rowell's certificate to operate the car, one of the officers told the men in the car that they would have to take the men to the police station. At the same time this officer stepped upon the running-board of Rowell's car, threw one of his legs over the rear door of the car, and told them to drive to the police station. At the same time he gave directions to the other officer to follow them in the other car. After going a short

distance, Rowell says that about two and one-half blocks, some-
one in the back of the car said, "Stop!" and Rowell stopped
the car. At this time Rowell and Wheaton were on the
front seat and Thompson, Bringhurst, and Wendell occupied
the rear seat of the car. A scuffle then started in the back
of the car. Thompson pulled his gun on the officer, and
the latter drew his gun, when Wendell grabbed it and Bring-
hurst jerked it out of Wendell's hand. The officer said,
"Oh, don't do that." Several shots were then fired, and the
officer was either pushed off the car by Wendell or fell there-
from to the street. Thompson then jumped out of the car
and started to run. In the meantime the other officer had
driven up in his car and called to Thompson to halt and
fired at him. At this time the second officer was slightly
in front of Rowell's car, but nearer the sidewalk. Shots
were then fired from the rear of the car and the second
officer fell. Thompson also fired at the second officer from
the street. Some of Thompson's shots broke the windshield
of Rowell's car and one passed through the left coat-sleeve
and shirt-cuff worn by Rowell. Something over twenty
shots were fired. Someone said, "Let's go," and Rowell
started up the car. After they started Bringhurst said he
killed the officer with his own gun, that he had to do it.
Rowell drove away from the scene of the shooting with
Wheaton still in the front seat and Bringhurst and Wendell
on the back seat of the car. Thompson left the car during
the shooting. The four occupants of the car drove to the
southern part of the city in the vicinity of Slauson Ave-
nue, where Bringhurst buried the officer's gun. At this point
Bringhurst and Wheaton got out of the car and Wheaton
took a University car for his home. Bringhurst said he
would walk home. Rowell, with Wendell, drove to Her-
mosa Beach and arrived at Wendell's home at about 11:30
P. M. To several persons at Wendell's home they told of
their trouble with the police officers. Rowell still had on
the coat and shirt showing the holes made by the shot from
Thompson's gun. In one of the conversations regarding
the affair Rowell said that they could not stand going to
the city jail, that they would not stand investigation, and
that it just meant one thing or the other. There was also
a conversation carried on at this time in which both Rowell
and Wendell took part and in which they each said that

all of them participated in the shooting. There is no evidence that Wheaton was armed, but Rowell had purchased a gun on that afternoon and was carrying it on the night of the shooting.

Rowell and Wendell remained in Hermosa Beach a few days, during which time Rowell had a new windshield put in his car. Wendell left Hermosa, saying that he was going to San Diego. Since then his whereabouts were never definitely known. There was evidence, however, introduced at the trial to the effect that he had committed suicide after leaving Hermosa Beach. Later on Rowell went to San Diego with his wife and child and returned to Los Angeles and went up to room 17 at 518 Grand Avenue, occupied at the time by Wheaton and Thompson, where he was arrested on the evening of December 22, 1921. Rowell was frequently seen prior to December 6th at the room of Wheaton and Thompson on West Eighth Street.

Wheaton, after leaving Rowell's car on the night of the shooting, went to his home on Eighth Street in the city of Los Angeles, between Grand Avenue and Hope Street, where he and Thompson were rooming at the time. Here he found Thompson. They remained in this room all the following day, receiving their meals through a window. Some time after this Wheaton and Thompson moved to room 17 at 517 South Grand Avenue, where Wheaton was arrested on December 21, 1921. Officers had been stationed inside this room, and on the afternoon of December 21st someone approached the door of this room from the outside and gave a couple of knocks. Upon being told to come in by the officers waiting within Wheaton opened the door and entered the room and was placed under arrest. On the following day Rowell approached the room, giving similar knocks, and, upon being told to come in by the officers, he entered and was also placed under arrest. Both Wheaton and Rowell told the same story as to why they had come to the room, saying that someone in the restaurant below had told them that they might find work by calling at this room.

Immediately after the shooting the two officers, Brett and Clester, were taken to the hospital where they were both found to be suffering from gunshot wounds, from the effects of which one of the officers died in about five minutes after reaching the hospital, and the other lived only about one

hour thereafter. Neither officer made any statement regarding the shooting before his death.

It further appears that on the night of December 3d, three days before the killing of the two policemen, the five men, Rowell, Wheaton, Bringhurst, Thompson, and Wendell, together with a sixth man by the name of Pearson, had held up a poker game near the plant of the Goodyear Rubber Company at the southern outskirts of the city of Los Angeles, from which they received between three hundred dollars and four hundred dollars, and later went to Hermosa Beach where they divided the money, each receiving about sixty-two dollars.

After the arrest of the defendants Wheaton and Rowell they were taken to the police station and they there made statements regarding the killing of the two officers on the night of December 6th. These statements were reduced to writing and signed by each of these defendants. Later on both Wheaton and Rowell appeared before the grand jury and told substantially the same stories as were contained in their written statements made previously at the police station. These statements made by the defendants, both at the police station and before the grand jury, were, over the objection of the defendants, admitted in evidence at the trial and read to the jury. While neither of the defendants, either at the police station or before the grand jury, admitted that they had anything to do with the actual killing of the deceased officers, or either of them, it is claimed by the defendants that the statements contained much that was damaging to the defendants' case, and that defendants were materially injured by the admission of said statements in evidence before the jury. These statements are referred to both by counsel for appellants and for respondent as "confessions," and they will be so treated for the purposes of this opinion.

The objection to their introduction was based upon the ground that no sufficient foundation had been laid showing that they were freely and voluntarily made and were not the result of threats and coercion on the part of the officers. It is claimed, in the first place, that the statements made at the police station were signed only after repeated threats had been made that unless the defendants sign such statements they would be shot and would never leave the station

alive. It is further claimed that their testimony before the grand jury was given upon the promise of some of the officers that if defendants would testify before the grand jury to the facts contained in their written statements that they would be used as state witnesses, and that no indictment would be returned against them for the murder of the two policemen. The trial court went fully into the question as to the voluntary character of these statements or confessions, not only receiving evidence in behalf of the prosecution, but defendants each took the stand and testified fully as to the conditions under which they made these confessions and also introduced other witnesses in support of their claim that these confessions were not made freely and voluntarily. At the conclusion of the evidence as to the admissibility of the confessions the court ruled in favor of their admission. The officers before whom the written statements were made and signed, and those accused of having made threats against the defendants, and those who, according to the testimony of the defendants, had made the latter promises of immunity, also testified and their testimony on the whole was to the effect that no threats had been made against the defendants, nor were any promises or inducements made to them to induce them to make these confessions. Each of the signed confessions made by the defendants, respectively, at the police station contains a statement that the defendant making the same was informed that he was under arrest charged with the crime of murder and that any statement made by him would be used against him, and he was then asked whether after being so informed he wished to make a statement regarding the shooting of the two police officers, to which he replied in the affirmative and then proceeded to give his version of the killing. On the occasions when the defendants were before the grand jury and prior to the giving of any testimony by either of them, each of said defendants was informed by the deputy district attorney conducting the case that the grand jury was then investigating the killing of two police officers in the city of Los Angeles, that said defendant with others was charged with the murder of said officers, and that it was the constitutional right of said defendant to refuse to testify at said investigation, but that in case he did so testify his testimony given before the grand jury might be used at the trial of

64 Cal. App.—5

the action against him. After being so admonished each defendant gave his testimony before the grand jury.

[1] Under these circumstances the record discloses ample evidence in support of the ruling of the trial court in admitting these confessions in evidence, and as this question was one primarily for the consideration of the trial court, its conclusions will not be disturbed by the appellate court when substantial support therefor is found in the evidence. (*People* v. *Fouts,* 61 Cal. App. 242 [214 Pac. 657].)

It is next claimed by appellants that the evidence is insufficient to justify the verdict in that it fails to connect either Wheaton or Rowell directly with the killing of either of the two policemen. It is true that there is no evidence that either of the appellants actually participated in the shooting of either of the two policemen, except in the testimony of Betty Quilette, who testified that in a conversation at the home of Wendell at Hermosa Beach, shortly after the shooting, both Rowell and Wendell said that all of the five men participated in the shooting. This evidence would not be binding upon defendant Wheaton, and it also appears to be contrary to the confessions of both Rowell and Wheaton, in which they stated that all the shooting was done by those in the rear of the car. The evidence in the case, however, establishes beyond controversy that the five defendants, on the night of the shooting, were jointly engaged in an expedition of crime. All were armed except Wheaton and they set forth on their night's work bent upon robbery or burglary, or any other crime whereby they might obtain means for the support of themselves and families. First they tried the house at Hollywood, which, after investigation, they determined that it was not safe to attempt to rob. Then they drove to the hardware store at Stephenson Avenue and were frightened away by a man coming out on the porch of the house on the opposite side of the street. Then a furniture store was suggested as a place where rugs could be procured. Up to this time there was no protest from any one of the five men against any of the criminal proposals of the others, but all apparently willingly participated in all that was done, and the only reasonable conclusion that can be drawn from their actions is that they all would readily have robbed the house at Hollywood or burglarized the store on Stephenson Avenue had it been

safe to attempt to do either.  Rowell did object to making a truck of his car when the proposal was made that they rob the furniture store of rugs, and said that he was going home, but this objection on his part was not to the commission of the crime, but was to the use of his car in carrying away the plunder.  It was at about this state of the proceedings that they became apprehensive that the police were on their trail and decided that it was wise to leave their field of operation and to make their escape from the police in case they were being followed.  In their endeavor to effect their escape the police officers lost their lives.

Admitting that neither Wheaton nor Rowell fired the fatal shot that killed either officer, or fired any shots at any officer, we find that Rowell took a most active part not only in the use of his car in conveying the other defendants to the different places that might be robbed, but also in endeavoring to escape from the officers after they were discovered.  As driver of the car he was to get a "cut" out of the Hollywood job if it were successful.  It is only reasonable to infer that he had the same understanding, or at least expectation, regarding the Stephenson Avenue jobs. He drove his car wherever the others directed, and he knew full well the purposes of their trips and anticipated a share in the proceeds of their ventures.  After the officers were killed he and three others of the party made their escape in his car, driven by him.

Wheaton, while not as active as the others, was fully aware of their intentions and the purposes of their trip both to Hollywood and to Stephenson Avenue.  When one of the five made the suggestion that "We can probably get some guns and Jim can sell them," he evidently meant Wheaton, and the latter acquiesced in this scheme at least by his silence.  He was the roommate af Thompson and was the friend and companion of all the others and with them, three nights before the murder of the two officers, he had held up a poker game near the Goodyear Rubber Works and had participated in the spoils of the hold-up.  His presence with the other defendants on the night of December 6th can only be accounted for upon the theory that he was one of them and stood ready to participate in any crime which they might decide to undertake.  [2]  The evidence shows that on the night of December 6th there was a thorough under-

standing among the five men to commit the crime of rob-
bery or burglary, or both such crimes, and if detected by the
officers to resist arrest, even at the risk of taking the lives
of those who should attempt to arrest them.   Under such a
state of facts, all who participated in any such understand-
ing or conspiracy are equally guilty of any crime which is
the natural and probable consequence of such an enterprise,
whether he personally commits the act or whether its com-
mission is done by any one of his associates in carrying out
the common purpose. (*People* v. *Vasquez,* 49 Cal. 560–562;
*People* v. *Lawrence,* 143 Cal. 148 [68 L. R. A. 193, 76 Pac.
893] ; *People* v. *Woods,* 147 Cal. 265 [109 Am. St. Rep. 151,
81 Pac. 652] ; *People* v. *Kauffman,* 152 Cal. 331 [92 Pac.
861].)

We would call attention particularly to the case of *Peo-
ple* v. *Kauffman, supra,* as a case very much in point.   In
that case six men in San Francisco decided to rob the safe
of the Cypress Lawn Cemetery, in San Mateo County.   Upon
arriving at the cemetery they found an armed man upon
the premises and decided to return to San Francisco, taking
with them the burglars' tools with which they had pro-
vided themselves for the purpose of breaking into the safe.
On their return trip to San Francisco they separated into
two groups of three men each for the purpose of lessening
the danger of detection.   All of the party were armed with
the exception of Kauffman, who had attempted to procure a
gun but had failed.   At the time of the shooting, however,
he was carrying part of the burglars' tools.   During their
return trip to San Francisco, an attempt was made to ar-
rest them by an officer named Robinson.   One of the six
men, not the defendant, fired and killed Robinson.   It was
held that the killing of Robinson was an act in furtherance
of a common design or conspiracy of the six defendants to
commit an unlawful act, and that therefore Kauffman, as
one of said conspirators, was criminally responsible for such
killing, although he took no active part in the attack upon
Robinson.

[3] The case at bar presents a much stronger set of
facts against the appellants than are to be found in the
latter case against Kauffman.   Measuring these facts by the
principles enunciated in the Kauffman and other cases, they

are sufficient to sustain the verdict of the jury finding the appellants guilty of murder.

[4] There was no error on the part of the court in admitting evidence of the robbery of the poker game on the night of December 3, 1921. The defendant Rowell and his wife both testified that Rowell was at his home at Hermosa Beach on the night of December 6, 1921. And on cross-examination they testified that he was at his home on the nights of December 3, 4, and 5, 1921. Other witnesses for the defense testified that the defendant Wheaton was at the home of one Patterson at 1036 Santee Street, Los Angeles, from 7 o'clock until 11 o'clock on the night of December 6th. On cross-examination they testified that Wheaton was at this same place on the nights of December 3, 4, and 5, 1921. The prosecution in rebuttal, and for the purpose of impeaching the defendant Rowell and the other witnesses who testified as to the whereabouts of Rowell and Wheaton on the night of December 3d, then undertook to show that neither Wheaton nor Rowell were at the places testified to by these witnesses on the night of December 3d, but, on the other hand, that they, with four other men, on the night on December 3d, held up a poker game near the Goodyear Rubber Works. It is true that this evidence tended to show that Wheaton and Rowell were guilty of an offense other than that set out in the indictment, but this did not render it inadmissible. (*People* v. *Argentos,* 156 Cal. 720–725 [106 Pac. 65].) This testimony was also admissible as tending to show a motive on the part of the defendants for the homicide of the two policemen. It explained why the defendants were so anxious to prevent arrest, and also explains Rowell's statement that they could not stand investigation. Knowing that they were all guilty of the crime of robbery, it is easy to understand why they might even take life before they would suffer themselves to be arrested, their crime found out, and the severe punishment meted out to them which the law affixes to the crime of robbery. (*People* v. *Pool,* 27 Cal. 572; *People* v. *Prantikos,* 164 Cal. 113–116 [127 Pac. 1029].)

[5] Neither was there error on the part of the court in permitting the prosecution to prove on cross-examination of Mrs. Rowell, wife of defendant Rowell, that she and her husband went under an assumed name between December

6, 1921, and the time of Rowell's arrest. This testimony was admissible as tending to show that said defendant was endeavoring to conceal his identity after the commission of the crime.

[6] The juror, Mrs. Dohs, was excused by the court for the reason that she was opposed to the infliction of the death penalty as a punishment for crime. It is claimed by appellants that her evidence as to her opposition to the death penalty was based upon a matter of principle with her and not upon any conscientious opinion entertained by her as to this mode of punishment. The juror, in her evidence as to her qualifications to serve on the jury, gave contradictory answers to questions propounded to her respecting her opinions regarding the infliction of the death penalty. On this evidence the court excused the juror. This ruling of the court is conclusive upon the appellate court. (*People* v. *Riggins*, 159 Cal. 113 [112 Pac. 862]; *People* v. *Ryan*, 152 Cal. 364 [92 Pac. 853]; *People* v. *Schoon*, 177 Cal. 678 [171 Pac. 680].) However, in view of the fact that the jury in their verdict fixed the punishment of the defendants by imprisonment in the state's prison for life, the question as to the state of mind of the jurors upon the infliction of the death penalty became immaterial.

A number of other objections are made by appellants against the judgment in this case, all of which have been considered by us, and we find no merit in any of them, neither do we find any error in the ruling of the court in giving instructions, or in refusing proposed instructions offered by the appellants.

The judgment and order denying a new trial are affirmed.

Conrey, P. J., and Houser, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 3, 1923.