[Crim. No. 4243. In Bank.—November 30, 1939.]

THE PEOPLE, Respondent, v. LEO WALLER, Appellant.

694

Beecher S. Stowe and Delphine Meyer for Appellant.

Earl Warren, Attorney-General, and Eugene M. Elson, Deputy Attorney-General, for Respondent.

KNIGHT, J., *pro tem.*—The district attorney of Los Angeles County filed an information charging the defendant Leo Waller in separate counts with the murder of Presley B. Stewart, and with having committed an assault with intent to commit murder upon the person of Dan Preston. It was also charged therein that said defendant had been previously convicted of burglary, for which he had served a term of imprisonment in the State of Illinois. He entered a plea of not guilty to the charge made in each count and admitted the prior conviction. The trial took place before a jury, and verdicts of guilty were returned against him on both counts. As to the first, the jury found by its verdict that the crime committed was murder of the first degree, and made no recommendation as to punishment. Therefore the verdict called for the imposition of the death penalty. A motion for new trial was made and denied, and following the pronouncement of sentence in accordance with the verdicts of the jury, the cause was brought before this court on an automatic appeal from the judgment of conviction on the first count and from the order denying the motion for new trial thereon.

It appears from the record without any dispute that Stewart was fatally shot and that Preston was beaten and shot shortly after 1 o'clock on Sunday morning, March 20, 1938, and that the shooting took place in "The Bee Hive Cafe" on East Whittier Boulevard in Los Angeles; and it was claimed by the prosecution that both crimes were committed during the perpetration or attempt to perpetrate a robbery therein by several persons, including the defendant. Those accused besides defendant were John Robles, Harry Groves, George Braun, and Mrs. Ann Groves, the wife of Harry Groves. A few days after the shooting Braun and Mrs. Groves surrendered to the police in San Diego, and shortly afterwards Robles and Groves were captured in Kansas City, Missouri. They were all returned to Los Angeles, charged jointly with the commission of said crimes, and placed on trial before a jury. After the trial started Robles withdrew his plea of not guilty to the charge of murder, pleaded guilty thereto, and was subsequently sentenced to life imprisonment. Mrs. Groves was acquitted, and the remaining two were found guilty, the jury having declared by its verdict that it was murder of the first degree, and life

imprisonment was recommended. Braun alone appealed, and on March 21, 1939, the judgments of conviction as to him were reversed. (*People* v. *Braun,* 31 Cal. App. (2d) 593 [88 Pac. (2d) 728].) Pending Braun's appeal the defendant Leo Waller was arrested in Danville, Illinois, and returned to Los Angeles; and on May 15, 1939, he was placed on trial with the result above stated.

In furtherance of his appeal his counsel has filed briefs wherein the several grounds urged for reversal are fully and ably presented and discussed. They all relate to the question of the sufficiency of the evidence, the substance of the major contentions made in this behalf being, first, that the evidence is legally insufficient to support the implied finding of the jury that the alleged crimes were committed during the perpetration or attempted perpetration of a robbery; and secondly, that in any event it is insufficient to establish the fact that the defendant herein was in the cafe at the time of the alleged commission of the crimes, or if present that he participated therein or was a party thereto. After a careful examination of the record we are unable to agree with either of the contentions so made.

The shooting of Stewart and Preston took place, as stated, shortly after 1 o'clock on Sunday morning. A few minutes before the shooting occurred a group of three men entered the cafe, walked to the bar and ordered drinks. The cafe at the time was filled with forty or more patrons, a large number of whom were sitting on stools or standing in front of the bar; others were seated at tables, and some were playing mechanical devices and musical instruments. Among the patrons present were Braun and Mrs. Groves. They had entered the cafe together several minutes before the group of three men appeared therein. The bar ran lengthwise of the cafe, and drinks were being served over the bar by two bartenders. One of them was an employee named Donahue, and the other was Stewart, the proprietor. Donahue waited on patrons at the end of the bar nearest the front door, and Stewart was stationed at the farther end. Donahue served the three men with drinks, and one of them intentionally or accidentally broke his glass on the bar, which caused a slight commotion; whereupon Donahue served him with another drink; meanwhile one of the men moved farther down along

the bar toward the rear of the cafe and beckoned to Donahue. As Donahue approached, the man said to him, ''Buddy, this is a stick-up''. Believing the man was joking, Donahue turned and walked back toward the other end of the bar and while passing Stewart said to him, ''This guy says it is a stick-up''. Stewart glanced toward the man who had said it, and then reached down behind the bar and drew a pistol. Instantly several shots were fired, and there was much confusion. Some of the patrons dashed for the exits, while others lay down on the floor or stood with their hands raised above their heads. Just before the shooting began Preston was seated in front of and facing the bar, and hearing a disturbance he turned around and saw one of the group standing behind him pointing a pistol at someone behind the bar. He grappled with the man and was struck on the head with a pistol and shot twice, once in the arm and again across the chest. Another patron named Rohrscheib stood near the front door with his hands raised and was accosted by two of the group. One of them held a pistol, and the other demanded Rohrscheib's ''roll''. He replied that he had none, and the man then leaned over to search Rohrscheib's hip pockets. As he did so Rohrscheib grappled with the man and while they were wrestling the man who held the pistol struck Rohrscheib on the head, knocking him down, and when he arose the man struck him in the face with a peanut vending machine. After the three men had fled Stewart was found lying unconscious behind the bar, mortally wounded with a bullet hole through his head, and Preston was found lying unconscious in front of the bar. It was also found that approximately $50 was missing from the cash register, which was located on the back bar close to the spot where Stewart was standing when shot; and during the confusion caused by the shooting one of the group was seen behind the bar.

Clearly the foregoing facts are legally sufficient to support the conclusion reached by the jury that Stewart was murdered and Preston assaulted during the perpetration or attempt to perpetrate a robbery. Counsel for defendant points out that there is no direct evidence showing that any one of the group took the money from the cash register; but in this regard the testimony shows that Donahue counted the cash in the register when he went on duty that evening; that

upon returning to the bar immediately following the shooting he found one of the drawers of the register open, and soon afterwards when the police arrived he checked the money in the register with the tape upon which the sales are recorded and found that approximately $50 was missing; and in connection therewith it was shown also, as stated, that instantly before the shooting began one of the group said to Donahue, "Buddy, this is a stick-up", and that before the group fled one of them was seen behind the bar where the register was located. Moreover, and quite apart from the matter of the money missing from the cash register, there is the direct testimony showing the attempt to rob Rohrscheib.

■ The evidence establishing defendant's participation in the crimes was both direct and circumstantial. The direct evidence consisted of testimony given by Mrs. Groves and Rohrscheib, bearing upon the identification of the defendant as the man with whom Rohrscheib was grappling in resisting the attempt to rob him. The identification of him by Mrs. Groves was made in positive terms. The circumstances relating thereto, as they are shown by her testimony, were these: For nearly a week immediately prior to the commission of the crimes Mrs. Groves, her husband, and the defendant lived together in the Commander Apartments on Ingraham Street in Los Angeles; and all three were well acquainted with Robles. Mrs. Groves had known him many years; and on the day preceding the shooting he was visiting the Groves and the defendant at their apartment. That afternoon all four began drinking, and they continued to drink during the evening. About 10 o'clock that night they visited the home of a Mrs. Martinson in the neighborhood. Braun was there also, and more liquor was consumed. While there Mrs. Groves undertook to teach the defendant to dance, and their actions angered Groves. A quarrel ensued between Groves and his wife, and he struck her. Thereupon, she left the place in company with Braun, and after driving about for a while in Braun's automobile, visiting several cocktail bars, they went to the Bee Hive. They arrived there some time after 12:30, and after they had been there for some little time Mrs. Groves heard someone near the bar say, "This is a stick-up". She looked around and saw her husband and Robles. Instantly the shooting began, and several shots were fired. Dur-

ing the confusion she observed Stewart standing behind the bar with a pistol in his hand, and saw him fire. She also saw Robles in front of the bar holding a pistol, saw him striking Preston over the head with it; and afterwards she saw him behind the bar. As to the defendant, she testified that she first observed him standing in the cafe near the front, and that after the commotion started she saw him grappling with Rohrscheib. In this regard, the essential portions of the testimony given by her on direct examination were as follows: "Q. . . . Now, I will call your attention to the defendant, Leo Waller; you saw Leo Waller there that night, did you not? A. Yes. Q. What was the defendant, Leo Waller doing, if anything? A. I don't think he was doing anything; just standing. Q. Where was Leo Waller when you first saw him? A. Oh, I believe, he was in the front of the cafe. Q. He was in the front of the cafe? A. Yes. . . . Q. You also stated that you saw Mack Rohrscheib there; is that correct? A. Yes. Q. Did you see anything happen between Mack Rohrscheib and the defendant Leo Waller? A. Well, not until all the commotion started and everybody was grabbing each other. Q. All right. After the commotion started then did you see Leo Waller doing anything in the cafe? A. Well, when they were all in the—that Rohrscheib just grabbed Leo. Q. You saw Mr. Rohrscheib grab Leo Waller, the defendant in this case; is that right? A. Yes, he was standing there. Q. All right. What did you see the two of them do, if anything? A. Nothing, just holding on to each other. Q. Well, what do you mean by holding onto each other? . . . A. Oh, I cannot remember everything, I mean every detail, how they were holding each other." Thereupon the court directed that the last question be read to the witness, and in response she answered, "Well, I would say they were wrestling. Q. By Mr. Galliano (deputy district attorney): Then you saw Mr. Rohrscheib and Mr. Waller, the defendant in this case, wrestling, is that what you mean? A. Yes." The witness was subjected to a rigid and thorough cross-examination upon the subject of her identification of the defendant, but throughout she steadfastly maintained that she saw the defendant in the cafe on the night in question under the circumstances above stated. In discussing her testimony on this appeal counsel for the defendant vigorously assails her credibility as a wit-

ness. He points out that according to her own testimony she had been drinking excessively most of the afternoon and evening, and he argues therefore that no value whatever can be attached to her identification of the defendant. He also calls attention to certain discrepancies between her testimony and that given by Rohrscheib as to the kind of clothing worn by the man with whom Rohrscheib grappled. As stated, however, in the case of *People* v. *Farrington*, 213 Cal. 459 [2 Pac. (2d) 814] : ''The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, and the uncertainties of the witnesses in giving their testimony were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for a new trial. It has approved the finding of the jury, and on appeal this court may not disturb such finding and the action of the trial court unless we can say, as a matter of law, that there was no evidence to support the conviction.'' (See, also, *People* v. *Radovich*, 122 Cal. App. 176 [9 Pac. (2d) 542], citing numerous cases.)

Rohrscheib's identification was that while he would not say positively that the defendant was the man who attempted to rob him, that he ''looked like him'',—that he ''resembled him''; and in this connection he was asked this question: ''Calling your attention to the defendant, Waller, you think now that the man that you saw there is similar or looks like Mr. Waller, is that right?'' and he answered ''yes''. The fact, however, that he was not positive does not destroy the value of the identification. As said in *People* v. *Wilson*, 76 Cal. App. 688, at page 700 [245 Pac. 781], it is not necessary that the identification be made in positive terms by any of the witnesses. And continuing, the court goes on to say: ''A conviction may be sustained though the witnesses decline to swear positively, and testify merely that they believe the accused is the person whom they saw commit the crime. Thus in *Commonwealth* v. *Cunningham*, 104 Mass. 545, the witnesses would not swear that the prisoner was the man they saw on the stolen wagon, but that 'he resembled him'. There the court said: 'Upon this question of identity, the evidence offered was all of it competent and proper for the consideration of the jury. It is impossible to say that it had no tendency

to convict the defendant. Its sufficiency was to be estimated and weighed exclusively by them.' '' Other cases holding that the identification need not be made in positive terms are *People* v. *Rolfe,* 61 Cal. 540; *People* v. *Franklin,* 46 Cal. App. 1 [188 Pac. 607]; *People* v. *Madsen,* 93 Cal. App. 711 [270 Pac. 237]; *People* v. *Radovich, supra.* It may be well to state also that Rohrscheib, without qualification, identified Robles as the man who held the pistol and struck him while he was grappling with the man who was attempting to rob him. Such identification was made from having seen Robles personally at the other trial, and from a photograph of him produced at the present trial.

■ Other important facts and circumstances disclosed by the testimony of Mrs. Groves tending to connect the defendant with the commission of the crimes were the following: As soon as the turmoil in the cafe resulting from the shooting had quieted down, she and Braun left together, and after driving first to Fourth Street where they stopped in the street for a few minutes, they continued on to the Groves apartment on Ingraham Street. There they found Groves, Robles and the defendant, and after a short discussion among them they decided that all should leave the state; thereupon, about an hour after the shooting, they entered two automobiles and drove first to Cross Roads, California, and thence to Phoenix, Arizona. One of the cars, a Pontiac, was driven by Groves, and he was accompanied by Mrs. Groves and Robles. The other, a Plymouth, was driven by defendant, and Braun rode with him. All remained in Phoenix for a day or two, and then decided to separate. Braun and Mrs. Groves turned back toward California, and eventually reached San Diego, where they decided to surrender to the police. The Pontiac car, it appears, had been stolen in Los Angeles several days prior to the homicide, not, however, by the defendant; and some time during Sunday, the day of the homicide, the license plates of the car were found in Mrs. Martinson's yard.

The evidence further shows that following defendant's arrest in Illinois he made a statement to the officers wherein he said that he left California the day after the Bee Hive robbery; that upon arriving in Arizona he read in the newspaper about the robbery and the murder. Continuing, he stated that after the five of them had stayed in Phoenix for

two or three days he separated from the others and made his way east through several states, including Texas and Oklahoma, up to Illinois; that while doing so he eluded being apprehended by using various *aliases,* one of them being Jimmie Wallace, and that he had secured a social security card under that name; and that one of the reasons he separated from the others was that the Pontiac in which they were traveling was a stolen car. It will be seen, therefore, that immediately after the crimes had been committed, and having had knowledge of the commission thereof, the defendant fled through several states, assuming *aliases* to avoid detection and arrest, which in itself may be considered as evidence of consciousness of guilt. As said in *People* v. *Murguia,* 6 Cal. (2d) 190 [57 Pac. (2d) 115], "Immediate flight, in the absence of any accusation—in advance, perhaps, of the probability of an accusation, formal or informal—may afford persuasive evidence of a consciousness of guilt", citing *People* v. *Erno,* 195 Cal. 272 [232 Pac. 710]. Moreover, testimony showing that a defendant has assumed *aliases* may be considered as tending to prove that he was endeavoring to conceal his identity after the commission of the crime. (*People* v. *Wheaton,* 64 Cal. App. 58 [220 Pac. 451].)

Finally, it may be stated that when the prosecution rested its case the defendant offered no evidence, nor did he take the witness-stand in his own behalf. As declared by section 13 of article I of the state Constitution, " . . . in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury."

The contention is made that Mrs. Groves was an accomplice in the commission of the crimes, and that such being the case her testimnoy has not been sufficiently corroborated to meet the requirements of the law. It is evident, however, that there is no evidence to justify the conclusion that she was an accomplice. As already shown, the jury at the other trial by its verdict of acquittal declared that she was not an accomplice, and there is nothing in the present record to establish that she was. Quite to the contrary, it appears therefrom that she had no reason to suspect that the robbery was

to be perpetrated. The contention so made is therefore without merit.

■ Such being the evidence and the state of the record, we are without legal authority to interfere with the verdict of the jury; for as shown, the evidence is legally sufficient to establish that Stewart was murdered during the perpetration or attempt to perpetrate a robbery, and that the defendant was one of the group who participated in the robbery. True, there is no evidence showing that defendant shot either Stewart or Preston; nor in fact does it show that at the time of the robbery he was armed. It is well established, however, that if a homicide is committed by one of several confederates while engaged in perpetrating the crime of robbery in furtherance of a common purpose, the person or persons engaged with him in the perpetration of the robbery but who did not actually do the killing, are as accountable to the law as though their own hands had intentionally fired the fatal shot or given the fatal blow, and such killing is murder of the first degree. The jury has no option but to return a verdict of murder of the first degree whether the killing was intentionally or accidentally done, and it is proper so to instruct the jury. (*People* v. *Perry,* 195 Cal. 623, 638 [234 Pac. 890]; *People* v. *Boss,* 210 Cal. 245 [290 Pac. 881]; *People* v. *Raber,* 168 Cal. 316 [143 Pac. 317]; *People* v. *Lawrence,* 143 Cal. 148 [76 Pac. 893, 68 L. R. A. 193]; *People* v. *Olsen,* 80 Cal. 122 [22 Pac. 125]; *People* v. *Denman,* 179 Cal. 497 [177 Pac. 461].)

■ And having found the defendant guilty of first degree murder the matter of the penalty was entirely within the discretion of the jury. (*People* v. *French,* 12 Cal. (2d) 720, 775 [87 Pac. (2d) 1014].) The jury was properly instructed as to its power to relieve the defendant from the extreme penalty of the law if in the exercise of its discretion the facts and circumstances so warranted; and since it failed to do so, it is beyond the power of this court to interfere therewith on appeal. (*People* v. *Boss, supra.*)

■ What has been said in determining the merits of the appeal from the conviction of murder applies with equal force to the conviction on the second count. The additional point urged with respect thereto is that there is no evidence showing an intent to kill. But obviously, in view of the un-

disputed testimony showing that Preston was beaten on the head with a pistol and shot twice, the jury was justified in finding that the assault was committed with the intent to kill.

The judgments of conviction and the orders denying the motion for new trial are, and each of them is affirmed.

Shenk, J., Curtis, J., Edmonds, J., Spence, J., *pro tem.*, and Houser, J., concurred.

Rehearing denied.