[Crim. No. 4628. In Bank. Aug. 3, 1945.]

THE PEOPLE, Respondent, v. ALBERT SIMEONE, Appellant.

Martin S. Ryan for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan and Thomas W. Cochran, Deputies District Attorney, for Respondent.

SCHAUER, J.—A jury found defendant guilty of four counts of robbery of the first degree and two counts of murder of the first degree and, as to the two counts of murder, made no recommendation as to penalty. Defendant's motion for a new trial was denied and he was sentenced to the state prison for the term prescribed by law on each robbery count and to suffer the death penalty on each murder count. He appeals from the order denying his motion for new trial and from the whole of the judgment.

Defendant urges as grounds for reversal that (1) the evidence, particularly as to counts I through IV (which counts include two robberies and the two murders), is insufficient to sustain his conviction, (2) the admission (without objection) of evidence of asserted prior offenses was prejudicial error, (3) the court erred in permitting cross-examination of defendant (in some instances without objection) as to offenses unconnected with the crimes for which he was on trial, and (4) the court erred in failing to give certain instructions. We have concluded that the evidence is legally sufficient to support the verdict as to each count and that the record is free from prejudicial error. The judgment therefore must be affirmed.

The four robberies were of cocktail lounges and bars in the city of Los Angeles and were committed during the period from February 8 through March 8, 1944. The two murders were committed in the perpetration of two of such robberies. The defendant testified that he did not commit any of the six crimes charged and introduced evidence of an alibi covering

the time of the commission of one robbery and murder (counts III and IV).

## Counts I and II
### *The Robbery and Murder of Joseph Martinez*

On the night of March 8, 1944, Joseph Martinez, owner of a cafe located at 2230 Whittier Boulevard, Los Angeles, was robbed and fatally shot. From the testimony of five witnesses it appears that on the evening of March 8 defendant was at the bar of the cafe from some time before 9:10 until after 11:45, when the bar closed. During this time defendant drank several Scotch and sodas. Mrs. Martinez testified that when the bar had closed and only she, Mr. Martinez, and defendant remained in the cafe, defendant produced a revolver, announced, "This is a hold-up," and forced Mr. and Mrs. Martinez to accompany him to their safe. Martinez opened the safe and handed defendant a bag of money. Defendant shot Martinez twice and ran out. As a result of the bullet wounds Martinez died on about March 11, 1944. The five witnesses (Mrs. Martinez, a waitress, and three customers) identified defendant with degrees of certainty ranging from "I am positive" to "I believe it is." They further testified that defendant wore a dark suit which resembled People's Exhibit 14 (a suit of defendant) and a gray hat which resembled People's Exhibit 15 (a hat which was found in defendant's car when he was arrested and which belonged to one Breckenridge, who was arrested at the same time). These witnesses had previously testified at the preliminary hearing of one Jetton that Jetton was the man whom they had seen at the Martinez cafe on March 8, but when they thereafter saw defendant they concluded that they had been mistaken in their identification of Jetton.

One Stoner, a police officer, testified that at a police show-up Mrs. Martinez said to defendant, "You are the man that killed my husband," and defendant replied, "If you say I am, lady, I guess I am." Defendant testified, "I might have said that. . . . Mrs. Martinez had told me that I was the man that shot her husband because of the suit I was wearing, and I laughed when she said that, because I knew I only wore that suit twice ever since I had it. . . ."

## Counts III and IV
### *The Robbery and Murder of Jack Asch*

On Tuesday night, February 8, 1944, at about 9 o'clock a

man (identified by three witnesses as defendant) armed with a .38 caliber revolver entered a cafe at 8201 Avalon Boulevard, Los Angeles, and announced, "This is a hold-up." The bartender, Jack Asch, at defendant's direction opened the cash register and took out money. Defendant shot Asch, took the money, and ran out. As a result of the bullet wound Asch died on about February 11, 1944. The robbery and shooting were completed and defendant ran from the cafe within three to five minutes. The three identification witnesses were seated at the bar and were from two to fifteen feet from defendant. They further testified that defendant wore a dark jacket which resembled People's Exhibit 30 (a jacket of defendant) and a dark hat.

Defendant testified, as alibi for the night of February 8, that on that evening from 7:30 until 11 or 11:30 o'clock he was at a school operated by one Nichols; that he left with Mr. and Mrs. Nichols and one June Ganahl. Mrs. Slee, a member of the school staff, Miss Ganahl, and Mrs. Nichols corroborated defendant's testimony that he was at the school on the night of February 8 and that he did not leave the building until about 11 o'clock. Defendant, however, was not continuously under the observation of any of these witnesses during the period of time when, they testified, he was at the school. Defendant and his witnesses testified that they recalled the date because on February 8 Miss Ganahl took an examination.

A police officer testified that, to check the time, he drove from the school to 8201 Avalon, entered the cafe, remained there for four minutes, and returned to the school, at no time exceeding a speed of 35 miles per hour; that the elapsed time was eight minutes.

On August 28, 1944, defendant and Nichols were confined in adjacent cells in which, unknown to them, a microphone was installed. At this time the police had not informed defendant of the dates on which the murders of which he was suspected were committed. (He was then being held on robbery charges other than those for which he is here prosecuted; it does not appear on what charge Nichols was held.) A transcript of the recorded conversation of Nichols and defendant was received in evidence and includes the following:

"SIMEONE: Do you remember when you closed the school up? . . . What nights did you have school? . . . Monday, Wednesday and Friday, or what?

"NICHOLS: Sometimes every night. . . .

"SIMEONE: That's where I was a couple of days, you see. . . . I know the place [the cafe at 8201 Avalon] because I went there a couple of times, and I saw the date on the folder, the *10th* [italics added] of February. . . . I wasn't operating at that time. . . . Mrs. Slee can prove I was there [at school], and if it was on a Monday, Wednesday and Friday, I can prove I was there to be there with June. . . .

"NICHOLS: Did that fall on one of those days?

"SIMEONE: I don't know. I am just hoping it falls on one of those nights. . . . Is my name on that list [the school records]?

"NICHOLS: Oh, sure, sure.

"SIMEONE: It is? Well, then, I have that beat."

Mrs. Slee's testimony as to the school records was as follows:

"Q. Was he [defendant] a student there at the school? A. Sometimes he was in classes.

"Q. Now, Mrs. Slee, you know what I mean when I say, 'Student', don't you? A. Not that I remember, that he was on the books.

"Q. As a matter of fact, you know that he wasn't, don't you? A. Yes."

The transcript of the conversation of August 28 between Nichols and defendant continues:

"SIMEONE: . . . [The police] told me where the place was on Avalon, 8201 Avalon. . . . [O]n up to seven months ago I stopped in two or three times and nobody has ever said anything to me. . . . So if they don't remember me then how . . . are they going to remember me in February if it was me? . . . There's proof that I wasn't even there. And besides when I went to that place it was real dark. . . . Do you remember when June took that test? . . .

"NICHOLS: I know you were there the night she was taking the examination. . . . June is your best bet. . . . It might be on that day when you were over there [with June Ganahl].

"SIMEONE: It will be on that day.

"NICHOLS: She kept dates pretty accurately on everything, I think.

"SIMEONE: It will be on that day.

"NICHOLS: Sure.

"SIMEONE: . . . I have got to find out if it was after seven . . . if it was before seven I don't know but I think it was after seven and I will ask them the time, and I will say,

'Who was shot? A man or a woman? How was the guy dressed?' I will say, 'That's funny. I have been there two, three or four times, six times, and nobody ever said anything when I was in there. . . . If they couldn't identify me then, how do they know I was in there?' . . . I didn't do anything. They charged me with it.''

Defendant stated to Nichols several times that he was so certain that he could ''beat the two murder raps'' that he intended to ''dicker'' with the police—to ask them to drop the robbery charges and to try him only on the murder charges.

February 10, the date on which defendant at the time of the above conversation believed the murder at 8201 Avalon was committed, was a Thursday. Mrs. Nichols testified for defendant that Monday, Wednesday, and Friday were the regularly scheduled nights on which Nichols conducted the school ''and sometimes . . . on a Tuesday also.'' (Asch was shot on a Tuesday.) On cross-examination she testified that Nichols sometimes held classes on Saturday and Sunday nights, thus leaving Thursday the only night on which, according to her testimony, school was never held.

## Count V
### The Robbery of Fletcher Marsh

According to the testimony of Fletcher Marsh, at about 10 o'clock on the night of March 2, 1944, the defendant entered Mr. Marsh's cocktail lounge at 4900 West Adams Boulevard, Los Angeles. Defendant wore a tan checked sport jacket and a gray hat. He drank three or four Scotch and sodas, which were served by Marsh. Shortly before 11 o'clock defendant produced a .38 caliber revolver, forced Marsh to open the cash register, and took the brown leather folding wallet of Mr. Marsh and the money which was in the cash register. In defendant's possession when he was arrested were Mr. Marsh's driver's license and notice of draft classification.

Defendant testified that in March, 1944, he purchased from one Sova (who immediately thereafter left Los Angeles) a brown leather folding wallet which contained Marsh's driver's license ''and some other credentials''; that Sova, before he handed the wallet to defendant, took from it ''a lot of money''; that defendant kept the papers and threw away the wallet. Also in defendant's possession when he was arrested were two union cards bearing the name ''Fletcher Marsh'' which, Mr.

Marsh testified, were not his. Defendant testified that he had typed the name on the cards; that he took the cards from one Hawkins on August 16, and over objection, that he obtained them in a robbery.

Miss Bobby Lee Barney testified for defendant that she had seen a worn brown pocketbook with "a lot of money in it" in Sova's possession about a week before he left Los Angeles in March or April and that she had seen defendant at Sova's home. A photograph of Sova was in evidence.

### Count VI
### The Robbery of Mrs. West Eichen

Mrs. West Eichen and one Zenor, a bartender, testified that shortly after 11 o'clock on the night of March 2, 1944, defendant entered the cafe of Mrs. Eichen at 5611 West Adams Boulevard, Los Angeles. Defendant wore a sport jacket with green sleeves and a brown or dark hat. He sat at the bar and drank 10 or 12 Scotch and sodas. At about 12 o'clock, when the other customers had gone, he produced a .38 caliber revolver, ordered Mrs. Eichen and Zenor to lie down behind the bar, and took money from the cash register.

Miss Barney testified for defendant that Sova had a tan sport coat with green sleeves.

### Evidence Showing Collateral Offenses

The prosecution without objection introduced evidence that on the night of January 26, 1944, at about 10 o'clock defendant robbed a cafe at 1408 West 54th Street, Los Angeles. Defendant is not charged with the crimes assertedly committed on that occasion. Paul H. Mark testified that defendant, armed with a .38 caliber revolver, entered the cafe, announced, "This is a hold-up," and fired two shots downward, one of which struck Mark's leg; that the bartender at defendant's direction handed money to defendant and defendant left. According to Mark, defendant then wore a dark jacket which resembled People's Exhibit 30 (except that Mark believed the jacket had a zipper fastening, whereas defendant's jacket had button closure) and a dark hat. Two other witnesses who had been with Mark on January 26 testified to the same effect. Defendant testified that he had never been in the 54th Street cafe. Bobby Lee Barney testified that Sova owned a black jacket with zipper fastening.

### Circumstantial Evidence and Admissions of Defendant

Defendant when he was arrested was carrying a .38 caliber

Colt revolver (People's Exhibit 13) in a paper bag. This gun, according to the testimony of the identification witnesses, resembled the gun used by defendant in the commission of the crimes above described. Bullets taken from this revolver and bullets found in a paper bag in defendant's car were received in evidence. According to the testimony of ballistics experts of the Los Angeles Police Department, in their opinion one of the bullets which struck Martinez was fired from People's Exhibit 13; the bullet which killed Asch and a bullet found imbedded in the wooden bar of the 54th Street cafe were so badly damaged that the experts could offer no opinion as to whether they were fired from People's Exhibit 13; they were fired from a .38 caliber Colt (or a Spanish imitation) and could have been fired from People's Exhibit 13. The three bullets were reloads with characteristics similar to those of the bullets found in defendant's car when he was arrested.

Defendant testified that he obtained the gun in May, 1944 (i. e., after the commission of the crimes) ; that prior to that time he had no gun; that he bought the gun through a newspaper advertisement from a man who lived in the vicinity of Baldwin Park and whose name and address he did not know; that he bought the gun as a birthday present for himself and not with the intention of using it to commit robberies, although such purpose later occurred to him. Mrs. Nichols testified that in March and April she helped defendant look through newspapers in search of an advertisement of a gun for sale.

There is testimony of admissions of defendant that he owned the revolver in February and March and of contradictory statements of defendant as to when and where he bought the gun, the amount he paid for it, and the purpose for which he bought it. Defendant at one time denied to the police that he was carrying the gun when he was arrested. In explanation of his changes of story with reference to the gun, defendant testified variously that he thought the police "were joking, so I was joking back with them"; that "when I saw the officers were not trying to help me I thought I would not try to help them"; and that he wished to avoid argument with the officers. He was asked, "You remember telling the police officers that you had this gun in February, don't you?" and testified, "I may have said that; that is correct. . . . I also said I had it in March and Janu-

ary, too, and April. . . . I told him several months, because that was a way of trying to recall when I had it.''

Other testimony of and on behalf of defendant was that he did not wear his suit or his jacket or a hat on the nights in question and that he did not drink Scotch and sodas. He admitted that he had told a doctor who examined him after his arrest that ''I have been drinking quite a bit the past several months, Scotch and sodas and Bourbon and sodas.''

### Defendant's Contentions; Points of Law

Defendant's argument as to the identification evidence concerns its probative force rather than its legal sufficiency. The matters to which he calls attention were considered and resolved against the defendant by the jury; their findings were approved by the trial court when it denied defendant's motion for a new trial; such findings are supported by competent evidence and we cannot disturb them. (*People* v. *Waller* (1939), 14 Cal.2d 693, 700-701 [96 P.2d 344]; *People* v. *Castro* (1945), 68 Cal.App.2d 491, 494 [157 P.2d 25]; 8 Cal.Jur. p. 594, § 585; 4 Cal.Jur. 10-Yr. Supp. (1943 rev.) p. 970, § 581, p. 974, § 585.)

Before we discuss separately defendant's contentions as to the evidence of collateral offenses, we note that the jury at defendant's request were erroneously told (by an instruction hereinafter quoted in full) that they could not consider any of such evidence, whether or not it was relevant. An examination of each of defendant's assignments of error discloses that no improper inquiry as to collateral offenses was allowed over objection.

Defendant contends that the admission of the evidence of the robbery of the 54th Street cafe and the shooting of Mark on January 26 (13 days before the first of the series of crimes for which defendant was on trial) was prejudicial error. As above stated this evidence was received without objection. Defendant did not move to strike the testimony. Therefore, he has no proper foundation on appeal to complain of its admission (*People* v. *Ferlin* (1928), 203 Cal. 587, 600 [265 P. 230]; *People* v. *Porter* (1932), 123 Cal.App. 618, 624 [11 P.2d 894]; 8 Cal.Jur. pp. 500-501, § 516), but even if we consider this belated objection it has no merit. Regardless of whether such evidence of the January 26 robbery was admissible as tending to show a general criminal plan or design on the part of defendant to rob cafes (see *People*

v. *Thorne* (1938), 10 Cal.2d 705, 708 [76 P.2d 491]; *People* v. *David* (1939), 12 Cal.2d 639, 647 [86 P.2d 811]; *People* v. *King* (1939), 13 Cal.2d 521, 527 [90 P.2d 291]; *People* v. *James* (1940), 40 Cal.App.2d 740, 744, 745 [105 P.2d 947]) it clearly was admissible to show that defendant possessed a .38 caliber revolver prior to the time when the offenses for which he was on trial were committed. (*People* v. *Nakis* (1920), 184 Cal. 105, 114 [193 P. 92]; *People* v. *Burkhart* (1931), 211 Cal. 726, 732 [297 P. 11]; *People* v. *Stoerkel* (1927), 87 Cal.App. 336, 341 [262 P. 825]; *People* v. *Wilson* (1941), 46 Cal.App.2d 218, 224 [115 P.2d 598].) In further corroboration of such fact there was testimony (contradicted by defendant) that defendant admitted to one Dr. Sisson that soon after his parole from Folsom State Prison in September, 1943, he bought a gun and "started out to hold up cafes and cocktail rooms."

██ The following four instances of cross-examination of defendant as to asserted collateral offenses are assigned as error:

Defendant was asked, "Didn't you know that as an ex-convict [defendant admitted four prior convictions of felony] that you had no right to even have the possession of a gun for any purpose?" His objection was overruled and he answered, "Yes." As above stated, defendant had testified on direct examination that he bought the gun as a birthday present for himself; prior declarations of defendant, received without objection, included admissions that he bought the gun with the intention of perpetrating robberies and a denial that he was carrying a gun at the time he was arrested. The question objected to was proper inquiry into defendant's purpose in buying and possessing the gun.

██ Defendant over objection testified on cross-examination that he obtained certain union cards on August 16, 1944, in a robbery which had no connection with the offenses for which he was on trial. On direct examination defendant had testified that in the wallet which he bought from Sova in March, 1944, were Marsh's driver's license and "some other credentials." On cross-examination he had testified that one of the union cards may have been and the other was in the wallet which he purchased from Sova. Thus the cross-examination complained of was proper not only to impeach defendant's testimony as to how he came into possession of the

union cards, but also to discredit his entire story as to the manner in which he obtained Marsh's wallet. (*People* v. *Gallagher* (1893), 100 Cal. 466, 476 [35 P. 80]; *People* v. *Morales* (1904), 143 Cal. 550, 553 [77 P. 470]; *People* v. *Madison* (1935), 3 Cal.2d 668, 678 [46 P.2d 159].)

The transcripts of a statement of defendant to police officers and of defendant's recorded conversation with Nichols, as to which there was no objection, motion to strike, or assignment of error, tend to show that defendant, with one Breckenridge, before and at the time of his arrest was engaged in attempts to cash stolen and forged checks, using stolen credentials as identification, and that it was this activity which led to his apprehension. A possible relation of this activity to the Marsh robbery (count V) is shown in the record in that on cross-examination defendant without objection testified as follows:

"Q. Calling your attention to People's Exhibit 37. . . . Is that the check that you say you were attempting to cash at the time you were arrested? A. Yes, that is correct.

"Q. Did you put Fletcher J. Marsh's name on there? A. Yes, I did.

"Q. You typed that on your typewriter? A. That is correct.

"Q. But you did not endorse the check? A. No, sir, I didn't."

Defendant now contends that it was error to allow such cross-examination. Regardless of the merit or lack of merit of such contention he cannot properly for the first time on appeal assign the admission of the testimony as error. (*People* v. *Johnson* (1933), 132 Cal.App. 265, 267 [22 P.2d 543]; 8 Cal.Jur. pp. 500-501, § 516.)

Defendant contends that he should not have been asked on cross-examination whether, as Dr. Sisson testified, he (defendant) admitted that soon after his parole from Folsom he bought a gun and "started out to hold up cafes." To this question there was no objection and defendant denied having made such statement. Plainly the question was proper.

Defendant next asserts that the trial court erred to his prejudice in refusing to give certain instructions requested by defendant and in failing to give other instructions of its own motion.

Defendant requested that the jury be instructed that "if, from the facts offered in this case, the jury finds that they can draw two equally reasonable conclusions, one

of which points to the guilt of the defendant, and the other of which points to the innocence of the defendant, it is the duty of the jury to adopt that conclusion which is consistent with the innocence of the defendant and to find him not guilty [etc.].'' The instruction was refused on the stated ground that ''Where as here the evidence is direct, there is no occasion for giving the instruction.'' Defendant. argues that as to counts I and II (robbery and murder of Martinez) the jury may not have believed the identification witnesses, in which event the sole prosecution evidence remaining for their consideration was circumstantial; i. e., the evidence connecting the bullet taken from Martinez' body with the gun which defendant had in his possession at the time of his arrest. Defendant's argument is technically sound but in the circumstances the refusal of the instruction does not warrant a reversal (Const., art. VI, § 4½), since the prosecution's case was based primarily on direct testimony of eyewitnesses and the circumstantial evidence was merely incidental and corroborative of the direct evidence. (See *People* v. *Lapara* (1919), 181 Cal. 66, 70 [183 P. 545]; *People* v. *Holden* (1910), 13 Cal.App. 354, 359 [109 P. 495]; *People* v. *Gorman* (1916), 31 Cal.App. 762, 763 [161 P. 757]; *People* v. *Ortiz* (1923), 63 Cal.App. 662, 667 [219 P. 1024]; *People* v. *Heuss* (1928), 95 Cal.App. 680, 684 [273 P. 583]; *People* v. *Williams* (1933), 134 Cal.App. 232, 236 [25 P.2d 259]; *People* v. *Marvich* (1941), 44 Cal.App.2d 858, 861 [113 P.2d 223].)

Defendant contends that the court erred in refusing the following instruction requested by him: ''The defendant is charged *in this Information* with *2* counts of *Murder and 4 Counts of Robbery* and is not charged with any other offense. If the evidence has convinced you beyond a reasonable doubt that the defendant has committed some other offense, that fact should not induce you to vote for a verdict of guilty as to any count in this information unless you are convinced beyond a reasonable doubt that the offense charged in the said count was committed. The defendant is not on trial for any other offenses other than *those set forth in this Information.* The jury should not convict the defendant of such offense unless convinced of that identical offense and beyond a reasonable doubt.'' The quoted instruction was a proper statement of applicable law and could well have been given. But any error in refusing such instruction was

cured by the giving of the following instruction which was requested by, and errs in favor of, the defendant: ''Where evidence is produced against the defendant unrelated to a particular offense, but tending to show the commission of other offenses by him, no matter how great the weight of such unrelated evidence to such other offenses, it must not be considered by you in any way as affecting the guilt or innocence of the defendant as to such particular offense. Each count in the information is to be considered separately and upon the evidence as to such count only, without reference to accusations or evidence of other offenses.'' By the last sentence of the quoted instruction the jury were incorrectly told, in effect, that they could not consider any evidence of any collateral offense for any purpose.

▮▮▮▮ Finally, defendant contends that the court of its own motion should have charged the jury that the evidence of the robbery of the 54th Street cafe on January 26 could be considered only to show that defendant at that time had possession of a gun. The defendant, having failed to request such an instruction, cannot now complain that it was not given. (*People* v. *Northey* (1888), 77 Cal. 618, 631 [19 P. 865, 20 P. 129]; *People* v. *Fultz* (1895), 109 Cal. 258, 262 [41 P. 1040]; *People* v. *Findley* (1901), 132 Cal. 301, 306 [64 P. 472]; *People* v. *James* (1940), *supra,* 40 Cal.App.2d 740, 746.) Moreover, as above stated, the jury at defendant's request were instructed in general terms that they could not consider evidence of a collateral offense even for such limited and proper purpose.

For the reasons above stated, the judgment as to all counts and the order appealed from are affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.