[Crim. No. 4735. Second Dist., Div. One. May 14, 1952.]

THE PEOPLE, Respondent, v. WILFRED WELLS
ROBARGE, Appellant.

Phil H. Curry and Albert S. Friedlander for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused of the crime of robbery. Three prior convictions on felony charges were alleged. It was also charged that at the time

of the commission of the offense charged against him defendant was armed with a deadly weapon, to wit, a .32 automatic pistol.

Defendant was duly arraigned and entered his plea of not guilty to the charge against him and denied the prior convictions pleaded in the information. However, when the cause was called for trial defendant admitted the aforesaid prior convictions.

Following trial the jury returned a verdict finding defendant guilty of the crime of robbery, and it was found to be robbery of the first degree. It was further found by the jury that at the time of the commission of the offense, defendant was armed as alleged in the information.

A motion for a new trial was denied and sentence pronounced. From the judgment of conviction and the order denying his motion for a new trial defendant prosecutes this appeal.

Since one of the grounds urged for a reversal is that the evidence is insufficient to sustain the judgment of conviction it becomes necessary to set forth an epitome of the facts which gave rise to this prosecution. . The record reflects that about 3 o'clock on the morning of March 5, 1951, Wendell Burton, the night manager of the Clock Drive-In Café located in the county of Los Angeles, was completing his duties preparatory to closing the establishment. The witness was in his office with the cook, George Schoonover, counting the day's receipts and preparing a deposit slip which indicated the total receipts for the day was the sum of $1,630, which reposed in a paper bag on the office desk. A further sum of between $1,600 and $1,700, representing the receipts for the preceding day, was in the office safe.

While the two men were engaged as aforesaid, a stranger was observed approaching the office door. Mr. Burton said, "What do you want?" to which the stranger replied, "This is a stickup," or "This is a holdup," and at the same time displayed a revolver.

Being in fear of the weapon in the hands of the intruder, Mr. Burton pointed to the money in the paper bag on the desk, saying, "There it is." The stranger then said, "Open the safe" and Burton replied that he did not have the keys. Thereupon the stranger replied in a harsher tone, "Open the safe" and Burton complied with the order. The cook, George Schoonover, was told to lie on the floor, which he did, lying on his stomach. Mr. Burton was then told to lie on the

floor on his stomach beside the cook with his hands over his head. Then someone opened the door and two other employees of the drive-in, namely, the janitor Dock Muldrow, and the dishwasher, Henry Manus, were ushered into the office and also told to lie on the floor. Mr. Burton and the other employees heard conversation between two persons in a mumbling tone. The telephone was then removed from the desk, the cord pulled from the wall, and the lights went off.

After a time, the victims got up from the floor in the office and called the police. It was discovered that both the $1,630 on the desk and the $1,600 or $1,700 that had been in the safe had been taken from the office.

Concerning identification of the parties participating in the robbery, Mr. Burton identified the stranger who first came into the office as a person who was brought into the courtroom during the trial and later identified as Arlow James Robearge. Mr. Burton testified that he did not see the defendant. The above named Arlow James Robearge was also identified as the stranger who entered the office by the cook, George Schoonover. This witness, however, did not see the defendant.

The witness Dock Muldrow testified that he saw the defendant when he entered the drive-in after the first participant had entered. The witness testified that he saw the first man go into the drive-in and that later the second man whom he identified as the defendant, came in and thrust a gun at him. That the defendant told the witness to fall in line, whereupon he followed behind the dishwasher, George Manus, who was also being ushered into the office by the defendant, according to the witness.

The witness Dock Muldrow testified he had a ''good look'' at the defendant, who, he testified, was wearing dark glasses. The witnesses Manus and Muldrow were also brought to the café office and forced to lie on the floor. Muldrow testified that the defendant Robarge was the man who had the gun ''on me.'' This witness also testified that Arlow James Robearge, the other man, identified in the courtroom as aforesaid, resembled the first man who came into the drive-in.

The dishwasher, George Manus, testified that the man who ushered Dock Muldrow and himself into the office first ''put a gun on him'' when he was in the dishwashing room. The witness Manus testified that as to the defendant, ''the only

thing that resembles to me is right in his cheek right here.'' The witness indicated the lower portion of the cheek and the front of the upper and lower jaws and around the nose, stating that it resembled him ''right in here.'' The witness Manus further testified that the defendant was about the same size as the man who ushered them into the office and that the latter's shoulder compared with that of the defendant. On cross-examination, the witness Manus stated that the defendant was about the same build as the man who ushered him into the office.

The defendant did not take the witness stand in his own behalf but rested his defense upon testimony by which he sought to establish an alibi. In this attempt he offered the testimony of his wife that on the morning here in question, her husband, the defendant, from whom she had been separated for several months, called upon her at about 1 o'clock at the restaurant where she was employed, located at 155th Street and Western Avenue in Los Angeles. That he left her about 1:50 a.m. and that at about 2:30 a.m. defendant returned, drove her to her home near 168th Street on Western Avenue, and remained with her in the automobile talking until about 4 a.m. when the defendant drove away.

Jack Buttrey, a taxicab dispatcher, testified that on the morning of the robbery, just prior to 2 o'clock, he saw the defendant in a café at Gardena in Los Angeles County, from which place defendant departed at about 2:15 a.m. That this café is located approximately 10 miles from the scene of the robbery. A sister of the defendant corroborated the testimony of the preceding witness that defendant was in the Gardena café at the time stated by the taxicab driver. Defendant's sister was employed as a waitress in the café. The mother of the defendant also testified in support of his alibi defense.

In an effort to impeach the foregoing testimony given by defendant's wife, the prosecution called Police Officer Coons who testified that he called on defendant's wife on or about April 16, 1951, and questioned her concerning the robbery at the Clock Drive-In. His testimony was that he stated to her (referring to her husband) that defendant claimed he was not present at the time of the robbery here in question, but could not refer the officer to anyone who would substantiate that statement. That he (Officer Coons) asked her, ''Do you know of anybody to whom I might talk who could put him some place away from that job?'' He testi-

fied that defendant's wife replied, "I do not know of anyone but I will inquire around and try to find if anyone can." The officer further testified that on April 25, 1951, he again went to the home of the defendant's wife and (referring to defendant) asked her, "Have you located anybody to testify for Sonny?" to which she replied, "No. I haven't."

In urging a reversal, appellant earnestly insists that the district attorney was guilty of prejudicial misconduct when, during the course of the trial, he caused appellant's brother to be brought into the courtroom from the county jail and identified as a participant in the robbery for which appellant alone was on trial. It should here be noted that, according to the record, at no time did the district attorney or anyone else refer to the man brought into the courtroom as the "brother" of the appellant. In connection with the appearance of this man in the courtroom the record shows that during the direct examination of the witness Wendell Burton, night manager of the Clock Drive-In, and one of the victims, the witness was testifying concerning the activity of one of the robbers (not appellant) and as to his ability to identify that person if he should again see him. Thereupon the following occurred:

"Q. Now, when you went back into the office did you turn your back on him or did you back into the office? A. No. I backed into the office.

"Q. You kept your face towards him? A. Right.

"Q. Could you see his features? A. Yes, sir.

"Q. Would you know him again if you saw him now? A. Yes, sir.

"Q. Let us find out. Mr. Bailiff—will the Court ask the bailiff, please, to bring in Mr. Arlow—what is that name—Arlow Robearge?

"The Bailiff: I am sorry; he was returned to Department 39.

"Mr. Veitch (Deputy District Attorney): May we have him ordered here?

"The Court: Yes. You make your arrangement to have him brought over.

"Mr. Veitch: Thank you."

It then appears that subsequently, and during the examination of the witness Burton, the following occurred:

"The Court: Mr. Veitch, I believe the party that you re-

quested to be brought over here has been—somebody has been brought from the County Jail.

"MR. VEITCH: Will the bailiff indicate him, please?

"Q. By MR. VEITCH: I call your attention to this man who has just been brought into the courtroom by the bailiff. A. Yes, sir.

"Q. Look upon him, and do you recognize him or not? A. Yes, sir.

"Q. Tell us where you first saw him; was he one of these men? A. He was the only man that I saw.

"Q. The only man that you saw? A. Yes, sir.

"Q. Now, do you mean by that that is the man whom you met at the door who had the gun in his hand and who stood behind the door in the position that you have told us about heretofore in your evidence; is this the man now before you? A. Will you take his glasses off, please?

"Q. Yes. A. Yes, sir.

"Q. That is the man."

It will be observed that up to the present time no reference whatsoever was made as to the name of the man just identified by the witness Burton. Thereafter, however, Deputy Sheriff Whaley was called by the prosecution and interrogated in part as follows:

"Q. Are you one of the investigating officers in this case? A. I am.

"Q. Were you present in the court room yesterday when upon request of the district attorney the bailiff produced a person from the prisoners' room and stood him here at the bar? A. I was.

"Q. That is while the witness Wendell Burton was on the stand? A. Yes.

"Q. And certain questions and answers occurred as between the district attorney and Mr. Burton, the witness? A. Yes, sir.

"Q. Are you personally acquainted with that individual? A. I am.

"Q. Do you know his name? A. I do.

"Q. What is his name? A. His name is Arlow James Robearge.

"Q. Spell it. A. (Spelling) R-o-b-e-a-r-g-e."

While it is true, as contended by the attorney general, that at no time was the man brought into the courtroom from the county jail referred to as appellant's "brother," and that the man's surname was spelled "R-o-b-e-a-r-g-e"

while appellant's name is spelled "R-o-b-a-r-g-e," we can not follow the reasoning of respondent that the jury caught that slight nuance and delicate change in the spelling of the two names when in sound and pronunciation they were identical. Judged by legal standards we fail to see the purpose of this procedure indulged in by the district attorney. Certainly it was not incumbent upon the prosecution to show that the man from the county jail was one of the perpetrators of the crime in order to make out a case against the appellant. If there was any materiality insofar as the case against appellant was concerned, in showing that the man produced in court was one of the robbers, then the fact that the latter was not on trial would not foreclose the prosecution from showing his participation in the crime, but such is not the case. ■■■ The record is barren of any purpose for producing the man in question unless it was to create the impression upon the jury that there was a relationship of brother between them and that the positive identification of the man in jail as a participant would serve to strengthen the somewhat uncertain testimony given by the only witness for the People who identified appellant as being present on the morning of the robbery, and to which testimony we shall hereinafter refer.

From a reading of the record we are constrained to say that it would be an impeachment of the legal learning of counsel for the People to intimate that he did not know the aforesaid procedure was improper, and peculiarly calculated to prejudice the substantial rights of the accused. Such procedure not only prevents the defendant from having that fair and impartial trial to which, whether innocent or guilty, he is entitled, but it may defeat the punishment of crime by jeopardizing a conviction when an accused is clearly guilty.

Respondent contends that the procedure above referred to did not prejudice the substantial rights of defendant in view of the conclusiveness of the evidence against him. We are convinced that the saving grace of section 4½ of article VI of the state Constitution should not come to the rescue of this conviction. As was stated by this court in *People* v. *Duvernay*, 43 Cal.App.2d 823, 829 [111 P.2d 659], " 'We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refus-

ing to set aside the judgment. (*People* v. *Davis,* 210 Cal. 540, 556 [293 P. 32].)' There is creditable authority for the statement that the phrase 'miscarriage of justice,' as used in the constitutional provision, 'does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. ''It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected.'' ' (*People* v. *Wilson,* 23 Cal. App. 513 [138 P. 971].) In the instant case we do not regard the evidence as sufficient to put into operation the provisions of section $4\frac{1}{2}$ of article VI of the Constitution, because even convincing proof of a defendant's guilt does not necessarily mean, under all circumstances, that there has been no miscarriage of justice. (*People* v. *Mahoney,* 201 Cal. 618 [258 P. 607] ; *People* v. *Patubo,* 9 Cal.2d 537 [71 P.2d 270, 113 A.L.R. 1303].) When a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law. (*Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].)''

 In the instant case the testimony identifying appellant as one of the participants in the crime cannot be characterized as clear and convincing. Several of the witnesses confessed their inability to identify him. True, the witness Dock Muldrow identified appellant but the verity of his testimony was diminished by contradictory statements and the conflict between testimony given by him at the preliminary examination and that given at the trial with reference to the height and appearance of the appellant. Another witness for the People, when testifying concerning the location of a door at the scene of the robbery, stated, with reference to testimony regarding the door as given by the aforesaid witness Muldrow, ''That is where Dock got messed up.'' The testimony of the other witness who identified appellant is

thus characterized by the attorney general in his brief, "not positive or free from doubt."

As will be seen from the evidence hereinbefore set forth, appellant produced unusually strong and impressive testimony in support of his defense of alibi.

It is true appellant did not take the witness stand in his own behalf. In making a decision in that regard his trial counsel was confronted with the fact that his client had theretofore been convicted of three felonies including the crime of robbery, an offense for which he was on trial; that under the provisions of section 2051 of the Code of Civil Procedure such convictions could be made a ground for impeachment; while if he remained off the witness stand these prior convictions would not be revealed to the jury.

While it is true that in criminal cases, the failure of a defendant to explain or deny by his testimony any evidence or facts in the case against him may be considered by the trier of fact, nevertheless, that does not impair or deprive an accused of his long recognized constitutional right not to be compelled to be a witness against himself (Cal. Const., art. I, § 13). An accused, therefore, has a legal right, which was exercised in the instant case, under the circumstances hereinbefore narrated, to remain mute and rely upon the legal insufficiency of the testimony produced by the prosecution to establish his guilt beyond a reasonable doubt.

And certainly his failure to testify should not, in an appellate tribunal, militate against his right to a fair and impartial trial, nor be considered, under the facts here present, in determining whether he received such a trial.

In venturing these observations as to the evidence, we speak, of course, only from the showing made by the record. It is true that the jury had an opportunity to observe the demeanor of the witnesses, their appearance upon the stand, and may have had reason to return the verdict which was found irrespective of the erroneous procedure indulged in during the trial. As to this, of course, we can say nothing. From the mere record, as we read it, however, the erroneous procedure indulged in may have turned the scale in favor of the prosecution. And the fact that the evidence may point rather conclusively to the guilt of an accused does not take from the latter his right to a fair and impartial trial.

We deem it pertinent to here set forth the admonition to trial judges and district attorneys in *People* v. *Black,* 73

Cal.App. 13, 43 [238 P. 374], as follows: "we feel impelled to direct the attention of district attorneys and trial judges to the frequent occasion which is thrust upon us to save judgments of conviction by means of the provisions of section 4½ of article VI of the constitution. It seems evident that the prosecutors of the state, and possible that the trial judges, are conducting criminal cases with an eye to the saving grace of the section. It should be manifest that such a course is improper. In the performance of their respective duties incident to trials, the existence of the section is of no concern to those officers. That part of the organic law of the state is of interest, so far as its application is concerned, if we except proceedings on motion for a new trial (see *People* v. *Tomsky,* 20 Cal.App. 672 [130 P. 184]), only to the courts of review. District attorneys and trial judges should conduct the trial of criminal cases exactly as if the section did not exist. Such a course, if faithfully and diligently pursued, will lessen the number of appeals, will shorten the time necessary for the consideration of appeals which are taken, will lessen the number of retrials by superior courts, and will conduce to the general dispatch of business in both trial and appellate courts."

Concerning respondent's contention as to the claimed inadequacy of appellant's objection to the course pursued and his failure thereafter to request the court to instruct the jury to disregard the testimony in question, we are of the opinion from an examination of the entire record that it shows the actions complained of to be of such a character as to have produced an effect which, as a reasonable probability, could not have been obviated by any instructions to the jury, and that the absence of an assignment and request in the trial court does not therefore preclude appellant from raising the point in this court (*People* v. *Stafford,* 108 Cal.App. 26, 29 [290 P. 920]).

(Attorneys representing appellant on this appeal did not appear for him at the trial, but, upon his request, were appointed by this court from the Los Angeles Bar Association Committee on Criminal Appeals, the members of which have volunteered to assist the court when an indigent appellant requests appointment by the court of counsel to represent him in a criminal appeal.)

We come now to a consideration of appellant's final contention that the evidence is insufficient to sustain the judg-

ment of conviction. In this regard, appellant's attack is mainly directed to the testimony relating to his identification as one of the perpetrators of the crime. ■ It is the function of the jury, in the first instance, to pass upon the credibility of the witnesses, and, in the second instance, for the trial court on the motion for a new trial. ■ While an appellate tribunal may consider the evidence in determining whether, as a matter of law it lacks the required substantiality, we may not weigh the evidence or refuse to give credence to witnesses we have never seen, unless it can reasonably be said that the testimony in question is so inherently improbable as to amount to no evidence at all, in which case the question is one of law. ■ The fact that a witness was not positive does not destroy the value of the identification. ■ It is not necessary that the identification be made in positive terms by any of the witnesses (*People* v. *Waller*, 14 Cal.2d 693, 700 [96 P.2d 344]). ■ The fact that a witness may to some extent qualify his testimony as to identification, goes to the weight of such testimony and is addressed to the sound discretion of the triers of fact. ■ It may therefore be said that the evidence in the record before us is sufficient to support the verdict rendered, but whether guilty or innocent, appellant was entitled to have the case fairly tried according to the established rules of law. The doctrine that respect for the law cannot be inspired by withholding the protection of the law is one which recognizes no exceptions.

The judgment and the order denying defendant's motion for a new trial are, and each is reversed, and the cause remanded for a new trial.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied May 28, 1952, and respondent's petition for a hearing by the Supreme Court was denied June 11, 1952. Shenk, J., Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.