[Crim. No. 5098.   Second Dist., Div. Three.   Jan. 28, 1955.]

THE PEOPLE, Respondent, v. CARL E. FIGUIEREDO et al., Defendants; WILLIAM R. HAGAN, Appellant.

David E. Agnew, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—William R. Hagan, the appellant herein, and Carl E. Figuieredo were charged in Count I of an information with robbery, committed on March 27, 1953; and it was alleged also that they were armed with a revolver at said time. In Count II Hagan was charged with robbery, committed on April 3, 1953; and it was alleged that he was armed with two revolvers at said time. (Other charges of robbery in the information were against Figuieredo.) It was also alleged that Hagan had been convicted previously of four felonies and that he had served terms of imprisonment therefor in the state prison. Hagan admitted the allegations as to his prior convictions. Upon motion by defendants, there was a separate trial for each defendant. In a jury trial, Hagan was convicted of robbery of the first degree as charged in both counts, and it was found that he was armed at the times the robberies were committed. Hagan appeals from the judgment and the order denying his motion for a new trial.

In filing his opening brief, appellant appeared in propria persona. Thereafter, pursuant to request of appellant that counsel be appointed to represent him, this court appointed Mr. David E. Agnew (member of the Los Angeles Bar Association Committee on Criminal Appeals) to represent appellant. Mr. Agnew accepted the appointment and has filed a reply brief on behalf of appellant.

Appellant contends that the deputy district attorney was guilty of prejudicial misconduct in having Figuieredo brought into the courtroom, in custody of a deputy sheriff, and then asking a witness, who was a victim of the robbery referred to in Count II (where only Hagan was charged), if Figuieredo was formerly employed by him. Appellant also contends that it was prejudicial misconduct of the deputy district attorney to offer, and it was prejudicial error of the court to receive, in evidence a statement by a witness (police officer) that Hagan said that he did time in San Quentin with Figuieredo.

With reference to Count I, Mr. Gettman, who was a clerk in a grocery store, testified that on March 27, 1953, about 7 p. m. while he and another employee Mr. Lynch were in the stockroom of the store, defendant Hagan entered the room with a revolver in his hand, "put the gun on" them, and told them to go into the restroom; they went into that room; Hagan asked which one knew the combination to the safe; Mr. Lynch replied that he knew it; Hagan gave Mr.

Lynch a grocery sack and told him to go to the front of the store, open the safe, and put the money in the sack; he also said that another man would go there with him; then Mr. Lynch left; Hagan stayed with Mr. Gettman in the restroom about five minutes and during that time they were facing each other; also during that time Hagan said, "I don't want any of your personal money, all we want is the money out of the safe"; then Hagan told him to sit on the toilet and not come out for 20 or 25 minutes; then Hagan left, and Mr. Gettman stayed there about 5 or 10 minutes, until Mr. Lynch returned.

Mr. Lynch testified that on said March 27, while he and Mr. Gettman were in the back room of the store, two men came in and one of them had a gun in his hand, said it was a holdup, and do as they said or they would shoot to kill; the man with the gun ordered them (two employees) into the washroom and asked who knew the safe combination; then Mr. Lynch replied that he had the combination; the man with the gun gave him a paper sack and told him to go with his partner (the other man) to the front of the store and put the money in the bag; they went to the safe and the man told him to open it; when the safe was open, the man told him to put the money in the bag; he put about $800 in the bag; then the man took the bag and went out the front door; Mr. Lynch went to the back of the store to see Mr. Gettman; since that time he (Lynch) learned that the man who went to the safe was Figuieredo. He also testified that he could not identify Hagan as the man who had the gun.

With reference to Count II, Mr. Joseph Bonelli, an employee of a tire store, testified that on April 3, 1953, about 8:40 p. m., while he was in the store, the defendant Hagan who was wearing khaki pants, brown leather jacket, brown hat, and glasses, came in and "pulled a gun" and told him to step back into the office (where Mr. Norwood was); when Mr. Bonelli went into the office, Hagan said, "I want the little green box you keep the money in." Then the deputy district attorney asked Mr. Bonelli if he knew Figuieredo. He replied that Figuieredo was a former employee of the store. Then he was asked (by the deputy) if he remembered when Figuieredo left that employment. He replied that it was a few years back. Then the deputy said, "May we ask the bailiff to bring Mr. Figuieredo to where Mr. Bonelli is so he could see him. I want to be sure of the identification." Counsel for Hagan asked what was "the materiality of identifying him, the man who is not charged?" The deputy

said that he expected to show Mr. Bonelli some articles that were found in Figuieredo's car. Counsel for Hagan said, "I object to this. I can't understand what the connection can be." The judge said, "While these men are being tried separately, it is always permissible and relevant to show an association for the purpose——." Counsel for Hagan said, "All right, then." The judge said, "The objection is overruled. Bring in Mr. Figuieredo." Then there were statements and questions as follows: "MR. COCHRAN [deputy district attorney] : That is far enough, Mr. Figuieredo. State your name, please. MR. FIGUIEREDO: Carl Figuieredo. MR. COCHRAN: Thank you. Q. Mr. Bonelli, did you see Mr. Figuieredo who was just brought into the courtroom? A. Yes, sir. Q. Is that the person who was formerly employed by you? A. Yes, sir. Q. When did he sever his connection? A. Oh, like I say, it must have been around 1949 or 1950. Q. Now, we have reached the point where you went back into the office that Mr. Norwood was in. Go ahead from there. A. Then he said, 'I want the little green box you keep the money in.' I told him it was in the other office and so he says, 'Go get it, and bring it out and lay it on the counter.' Q. Did you have such a box? A. Yes. Q. Had you had a little green box for some period? A. We have always had that. Q. Did you have it when Mr. Figuieredo was employed there? A. Yes. I went back and got the green box and put it on the counter." Then Hagan told Bonelli to scoop out the paper money. Bonelli took about $255 in paper money from the box and handed it to him. Hagan asked which one knew how to open the safe. Bonelli replied that it was open. Hagan then "got out" a second gun and, with both guns in his hands, marched Bonelli and Norwood to the safe which was open and in which there were some stamps. Hagan did not take the stamps, but he did take $9.00 from Bonelli's wallet and $4.00 from Norwood's wallet. Then, after telling them to stay in the back room 15 minutes, Hagan left. Bonelli also testified that glasses (Exhibit 8) and a hat (Exhibit 5) were similar to glasses and a hat worn by Hagan at the robbery; and that he was certain that Hagan was the man who held him up.

Mr. Norwood, the credit manager of the tire store, testified in substance the same as Mr. Bonelli testified. He also testified that he was certain that Hagan was the man who robbed him.

Officer Simon testified that he and another officer arrested Hagan on April 6, 1953, and at that time they found a loaded revolver on his person. The next evening Officer Simon asked Hagan if he knew anyone by the name of Gene while he was serving time in San Quentin. Hagan replied in the negative. Counsel for Hagan then (in a ''Consultation at the bench'') said that he thought the answer regarding San Quentin was prejudicial and a ground for a new trial, and he moved that the answer be stricken out. The motion was denied. Officer Simon testified further that shortly after the arrest of Figuieredo on April 10, Hagan and Figuieredo had an opportunity to see each other in the jail. On April 11, Hagan said to Officer Simon, ''I see you got Gene. I didn't want to get him involved before.'' Officer Simon said to him, ''Is this Gene that you did time with, the last time in San Quentin?'' Hagan replied ''Yes.'' Officer Simon asked how long he knew him, and he replied, ''Approximately two years.'' Officer Simon testified that when Figuieredo was arrested he (officer) found three hats (one light blue, one dark blue, one khaki), a blue jacket, and a pair of glasses in the automobile that Figuieredo had been driving.

Mrs. Truehill, called as a witness by defendant, testified that on April 3, 1953, about 7 p. m., she went to Hagan's home to pay Mrs. Hagan for taking care of her children; she stayed there an hour or more, and during that time Hagan was there; she returned to her home about 8:30 p. m.

Mr. Henkel, called as a witness by defendant, testified that on April 3, 1953, at 7:30 p. m., he called the telephone number at defendant's apartment and talked to him; that about an hour later he called defendant again by telephone at that number and talked to him.

Mrs. Henkel testified that on March 27 defendant (her brother) came to her home about 3 p. m. and stayed there until about 9:30 p. m.

It was stipulated that if defendant's wife were called as a witness she would testify that on March 27 she and defendant had dinner with the Henkels and the Henkels took them home later that evening; and that on April 3 her husband was home with her in the apartment all evening.

Defendant did not testify.

It was prejudicial error to permit the deputy sheriff to bring Figuieredo into the courtroom. When Mr. Bonelli, as a witness regarding Count II (tire store), said that Hagan asked for the little green box, the deputy district attorney

asked Bonelli if he knew Figuieredo. When Bonelli replied. that Figuieredo had been an employee of the tire store a few years previously, the deputy asked the bailiff to bring Figuie-redo in because he (deputy district attorney) wanted "to be sure of the identification." Up to that time, Bonelli had not referred to Figuieredo. Up to that time, and thereafter, there was no competent evidence which tended to connect Figuieredo with either robbery. As to Count I, neither of the victims (Gettman or Lynch) identified Figuieredo as the other man who took Lynch to the safe. Lynch did say that he had learned later that Figuieredo was the other man. That, however, was not competent evidence. As to Count II, Figuieredo was not charged with that offense, and neither of the victims (Bonelli or Norwood) or anyone referred to Figuieredo as having had any connection with the robbery. The deputy district attorney asserted, as an explanation of his request that Figuieredo be brought in, that he expected to show the witness some articles that were found in Figuieredo's car. (Prior to that request, a hat (Exhibit 5), had been shown to him.) After such request, the only article shown to him was a pair of glasses. It was not necessary to have Figuieredo identified before the jury by Bonelli or anyone as a former employee of the tire store, or identified at all, as a foundation for asking Bonelli whether he could identify the articles as having been worn by Hagan at the robbery. Any or all of the articles could have been shown to witness Bonelli, for the purpose of ascertaining whether he could identify them, without having Figuieredo brought before the jury. As above stated, the deputy district attorney had shown Exhibit 5 (the khaki hat found in the car) to witness Gettman, prior to having Figuieredo brought before the jury. The statement of the deputy district attorney that he wanted to be sure of the identification of Figuieredo tended to create the impression that identification of Figuieredo was material for some important purpose in the trial. The identification of him was immaterial. The question by the deputy, as to whether Bonelli knew Figuieredo, came immediately after Bonelli said that Hagan asked for the little green box. The asking of that question at that time, the request that the bailiff bring Figuieredo in, and the bringing him in by the bailiff, when considered in connection with the evidence that Figuieredo was a former employee of the tire store and that Hagan knew him in San Quentin, tended to create inferences as follows: that Figuieredo, an ex-convict acquaintance

of Hagan and former employee of the store, was connected in some way with Hagan's asking for the little green box; that Figuieredo was in custody of the sheriff upon a criminal charge that was connected in some way with Hagan; and that Hagan was an associate of Figuieredo. Also, the statement of the trial judge that Hagan and Figuieredo were being tried separately (which was made in ruling upon the request to bring Figuieredo in) tended to create an inference that Hagan and Figuieredo were jointly involved in the commission of a crime. There was no competent evidence in support of such inferences.

On behalf of plaintiff, there was testimony by Gettman, Bonelli and Norwood that Hagan was the robber. On behalf of defendant there was testimony that at the time one robbery was committed Hagan was at the home of the Henkels, and at the time of the other robbery he was at his home. In view of such conflict in the evidence as to the identity of the robber, the errors in creating the derogatory inferences against defendant were significant. In *People* v. *Robarge*, 111 Cal.App.2d 87 [244 P.2d 407], wherein the charge was robbery, there was a close question as to identity of the robber and there was strong evidence in support of the defense of alibi. A witness therein was testifying concerning one of the robbers (not appellant therein) and as to his ability to identify him if he should see him again. Then the deputy district attorney requested the court to order the bailiff to bring one "Robearge" into court. The order was made and thereafter the judge said that "somebody" has been brought from the county jail. The deputy district attorney asked the witness if he recognized the man who had been brought in by the bailiff. The witness replied in the affirmative. Thereafter a deputy sheriff, who was present when the man was in court, was called as a witness and was asked by the deputy district attorney if he knew the name of the man. He replied that his name was "Robearge." On appeal therein it was said (p. 94) that the record was barren of any purpose for producing the man in court unless it was to create the impression upon the jury that there was a relationship of brother between them (the name of the man and the name of defendant having the same pronunciation) and the positive identification of the man from jail as a participant in the robbery would serve to strengthen the somewhat uncertain identification testimony on behalf of the People. The court therein also said (p. 94) that the procedure was improper and calculated to prejudice

the rights of defendant; that (p. 96) the erroneous procedure may have turned the scale in favor of the prosecution, and it prevented defendant from having a fair trial. The judgment of conviction therein was reversed. In the present case, the aforesaid improper inferences, created by bringing Figuieredo before the jury, prevented defendant herein from having a fair trial.

Appellant also contends, as above stated, that it was prejudicial misconduct of the deputy district attorney to offer, and it was prejudicial error of the court to receive, in evidence testimony of Officer Simon that Hagan had said that he did time in San Quentin with Figuieredo. Prior to impaneling the jury, a conference was held in chambers regarding the allegations of prior convictions. At the conference the judge, the deputy district attorney, defendant and his counsel, and the reporter were present. The judge asked defendant what his desire was with reference to the allegation of prior convictions. Defendant asked the judge to clarify that for him, and asked ''Will that not be brought out in court?'' The judge said, ''No. That is the purpose of coming in here, so it will not get to the ears of the jury.'' The deputy district attorney said that the judge should explain the possibilities if defendant takes the stand. The judge told him that if he took the stand the district attorney could ask him whether he had been convicted of a felony; and if he did not admit the priors then the allegations of priors would be read to the jury. The judge also said that if defendant admitted the priors and did not take the stand the district attorney had no way of showing that he had been convicted of a felony. Defendant said, ''I see, with the understanding that the priors could not be read in front of the jury?'' The judge said, ''They could not, if you admit them here now.'' The deputy district attorney said, ''If you don't take the stand, and admit them now, the jury will never know anything about your priors. Is that clear?'' Defendant said, ''Yes, sir. I wanted it clarified.'' The deputy said, ''I want to be sure you do understand it. What is your desire?'' Defendant said, ''Well, I am admitting the priors.''

When Officer Simon was testifying on direct examination the deputy district attorney asked him if he had any conversation with Hagan as to whether he knew Figuieredo. The officer replied in the affirmative, and the deputy asked him to relate the conversation. The officer said he asked Hagan if he knew anyone by the name of Gene; that Hagan replied

"No"; then the officer asked him if he knew anyone by the name of Gene while he was serving time in San Quentin. Counsel for defendant moved that the answer be stricken out. The motion was denied. Officer Simon also testified on direct examination that he asked Hagan, "Is this Gene [referring to Figuieredo] that you did time with, the last time in San Quentin?"; that Hagan said "Yes." The officer was an arresting and investigating officer in the case, and it is reasonable to assume that he knew that defendant had admitted the prior convictions. His references in his testimony to defendant having been in San Quentin were unnecessary and were calculated to disclose that defendant was an ex-convict. Such references constituted grounds for a new trial. In view of the context of the questions and answers on direct examination of the officer regarding conversations with defendant, it is reasonable to assume that the deputy district attorney knew that the conversation to be related by the officer would show that Hagan and Figuieredo had been in San Quentin. In view of the assurance which the deputy district attorney gave defendant that if he admitted the priors and did not testify his prior convictions would never be known by the jury, the questions by the deputy under circumstances which would permit references to serving time in San Quentin constituted prejudicial misconduct. The references by the officer to San Quentin deprived defendant of a fair trial.

The bringing of Figuieredo into the courtroom and the disclosure that Hagan had been convicted of a felony were unnecessary from any legal viewpoint. The trial judge should have granted a new trial.

The judgment and the order denying a new trial are reversed, and the cause is remanded for a new trial.

Shinn, P. J., and Vallée, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 24, 1955. Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.