THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JAMES CERCE, DEFENDANT-APPELLANT.

Argued September 17, 1956—Decided October 4, 1956.

*Mr. Anthony A. Calandra* argued the cause for appellant (*Mr. Aaron Dines,* on the brief).

*Mr. Archibald Kreiger,* Deputy Attorney-General, argued the cause for the State (*Mr. Charles S. Joelson,* Deputy Attorney-General, Acting County Prosecutor, attorney).

The opinion of the court was delivered by

WACHENFELD, J. This is an appeal by James Cerce, the defendant, from a conviction of second-degree murder, resulting in the imposition of a prison sentence of 25 to 30 years. In its broadest aspect, the defendant's main insistence is that his guilt was not established beyond a reasonable doubt.

The same theme is pursued under a number of different points, including error in refusal to grant a motion for judgment of acquittal, alleged insufficiency of identification, failure to sustain the burden of proof, and the assertion that the verdict was contrary to the weight of the evidence.

The issues thus raised require a factual analysis of the record and the evidence presented.

The defendant was charged with slaying his wife, Roberta, shortly after he found her in bed with another man, Mario Moreschi, at the Cerce home in Clifton, New Jersey. The

events surrounding the crime were almost exclusively developed by witnesses for the State as the defendant relied primarily upon his plea of not guilty and did not take the stand to testify.

The defendant and his wife lived at 1 Grant Avenue in Clifton, but in the early part of 1955 moved for the summer to a rented apartment in Belmar, New Jersey. On July 28, 1955, around noon-time, the defendant left the apartment and went to the Monmouth Race Track. The decedent likewise left the apartment, dressed in bathing attire, and went to the beach at Avon. While on the boardwalk there, she encountered Mario Moreschi, a New York resident, formerly a bartender at the Avon Inn, whom she had known slightly the previous summer. In response to her request, he drove her to a friend's house at Monmouth Beach, where they had a drink or two. Shortly thereafter they left and visited a restaurant and bar in Sea Bright, New Jersey.

Moreschi's vacation was terminating, and he was planning to return to New York in order to resume his employment on the following day. Apparently it was finally agreed that after he checked out of his hotel Roberta would change her attire and accompany him in his car as far as her home in Clifton, where they would stay overnight. In response to mutual inquiries, each informed the other that, although married, they were living apart from their respective spouses. They left the shore area in the late afternoon.

When the defendant returned to his apartment at Belmar after the races, his wife had already departed. He inquired of the landlady as to her whereabouts but received no information. A witness for the State who saw the defendant at the race track described him as wearing dark trousers and a white summer shirt with short sleeves and his initials over the shirt pocket. "He had a tear on the left sleeve of his polo shirt."

Moreschi and the decedent stopped at a restaurant in Newark and then continued on their journey to Clifton. Dramatically enough, at about the same time the defendant was also en route to northern New Jersey. A State's witness

testified that at 8 o'clock on the night in question Cerce was at a restaurant called "City Gardens" in Paterson. A Paterson newsdealer testified he sold the defendant a newspaper between "nine and nine-thirty that evening."

There was undisputed evidence that the defendant was at the White Horse Tavern in Paterson later in the same evening. He attempted to borrow $300 from the proprietor of the inn and had a long conversation with him in endeavoring to obtain at least some financial assistance. This witness described him as wearing a "white sport shirt" and "dark trousers." "He had a rip in his shirt." Cerce left the tavern at approximately 10:30 P. M.

According to the record, while the defendant was in the White Horse Tavern, Moreschi and the decedent arrived in Clifton at Cerce's home. Moreschi parked his car in front of the house and locked it. They tried to enter through the front door using her key but were unable to do so because the door had a bolt on the inside. They gained admittance by the rear, making use of her key.

They passed through the kitchen and into the living room and then turned on the lights. A short time thereafter, she announced she was going upstairs to turn on the air conditioner to cool off the bedroom. They had a drink or two until about 10:40 P. M., when they went upstairs to the bedroom.

There was a fan going in the hall at the head of the stairs, and the air conditioner was operating. The bedroom was suffused by a soft amber light. Both occupants disrobed and entered the bed, their platonic relationship terminated, and some 10 or 15 minutes later they fell asleep.

Some time later, Moreschi abruptly awakened to see a man in dark trousers and a white shirt standing "maybe a foot" away from him. The "intruder" struck at Moreschi with what appeared to be a crumpled pillow, grazing and scratching his face. Moreschi vaulted over his female companion and hastily retreated downstairs. He was unable to open the front door so he ran through the house to the rear and out onto Grant Avenue. He was not impeded in

his maneuvers by any article of clothing, having left the bedroom completely nude. He ran up the street a block or more.

After a breathing spell, Moreschi cautiously began to pick his way back toward the Cerce home on the opposite side of Grant Avenue. He looked for clothes in some parked automobiles and rang several doorbells but got no response. Eventually, he entered a garage almost directly across from the Cerce ,residence. There he discovered a weight. As Moreschi left the garage with the weight, he noticed a large automobile, either a Cadillac or a Chrysler, circling the block. He hid and watched this automobile pass two or three times, slowing down, "practically to a crawl," in front of the Cerce home. He could not see the driver.

Eventually, Moreschi went across the street and smashed the window of his car with the weight. He attired himself in slacks and a sport coat and walked three or four blocks to a place called "Richards Drive-In." There he persuaded three young boys to call the police for him.

A Clifton police patrol car arrived at the drive-in at about 1:00 A. M., and Moreschi told the officers what had occurred. The police, taking Moreschi with them, drove to the Cerce home. Other police officials arrived, and they entered the rear yard, which was in darkness. A flashlight employed by one of the policemen revealed the body of Roberta Cerce. She was lying at the foot of the steps in a pool of blood, dressed only in a bathrobe. She had been shot twice. One bullet wound was on the midline of the neck about two inches below the chin and surrounded by powder burns, while the other point of entrance was two inches back of the tip of the ear lobe in the neck.

The house was dark and completely locked. The officers entered by breaking a screen on the kitchen window. The back door could not be locked except with a key. The air conditioner in the bedroom and the fan at the head of the stairs were turned off, as were all the lights.

The bed was crumpled. Moreschi's personal belongings were found on a hassock in the bedroom. Articles of clothing

of the decedent and her personal effects, including a set of keys to the house and a handbag, were found on the dresser. At the foot of the bed was a man's bathrobe and two laundered, personally initialed white shirts belonging to the defendant.

A search of the room, described as a man's dressing room or den, adjoining the bedroom revealed a trail of bullets extending at short distances from a desk. They were .32 calibre Smith & Wesson's. One cartridge was lying on the floor close to the desk. Another was discovered just inside the dressing room door, and three more were found in the upstairs hall leading toward the stairway to the first floor. The bullets were all of the same calibre as those which had killed the victim.

During the next few days, the officers found two lead pellets outside of the house, one in a doormat near Roberta's body and the other on a ledge of the house next door to Cerce's home. The police found five empty cartridge casings in the driveway near the back porch. There were four bullet markings on the garage wall adjacent to the rear porch where Roberta's body had lain and one such marking on the rear sidewalk.

A witness, Robert Dubnoff, who lived diagonally across from the Cerce residence, informed the police and testified at the trial that on the night in question at around 11:55 P. M. he had heard two shots followed by a slight interval of quiet and then three or four more shots.

Around 6 o'clock the next morning an alarm was released by the Clifton police to the Belmar authorities asking for the apprehension of the defendant. At 7:00 A. M. the Belmar police observed the defendant's black Cadillac parked in front of his summer apartment. They went to the apartment and were admitted by Cerce. Their revolvers were drawn as they entered. The defendant was in the midst of shaving and had on only his pajama bottoms. When informed he was in custody and would have to go to the Belmar police headquarters, Cerce merely asked for permission to finish shaving. His request was granted, and he

completed the process while the police, still with guns drawn, waited for him. At no time did Cerce ask the reason for his arrest or for an explanation as to why he was being taken into custody.

At Belmar police headquarters, Cerce was fingerprinted and then questioned by several officers who had come from Clifton. When told his wife had been murdered, he merely extended one hand and shrugged his shoulders. He asked no questions about the circumstances of her death. Cerce refused to discuss or give any information concerning his whereabouts after 7:00 P. M. on the previous night.

The defendant was returned to Clifton and placed in a lineup with four city employees. Moreschi identified Cerce as the "intruder" in the bedroom of Cerce's home.

The defendant asserts the evidence, being entirely circumstantial, does not measure up to the standards required in a homicide case, and that, in view of the probabilities of the commission of the crime by some one other than the defendant, there was error in denying his various motions heretofore mentioned.

Both sides subscribe to the requisites of a circumstantial case justifying conviction as set forth in *State v. Donohue,* 2 *N. J.* 381, 390–91 (1949):

"* * * all of the circumstances not only must concur to indicate a defendant's guilt but they must also be inconsistent with any other rational conclusion. It is not enough that they coincide to render probable the hypothesis advanced by the prosecution; they must also exclude beyond a reasonable doubt every other hypothesis except that of guilt. *Jackson v. Delaware, L. & W. R. Co.,* 111 *N. J. L.* 487 (*E. & A.* 1933). Where the essential facts are proved, and where they cannot be rationally explained on any theory other than that the defendant is guilty of the crime charged, such circumstantial evidence will be considered as convincing as evidence of a direct and positive character."

The defendant, however, emphasizes the meretricious relationship between the decedent and Moreschi and points to certain evidence not produced by the State, such as the presence or absence of fingerprints, the gun used in the

crime, an explanation of Moreschi's failure to hear the shots fired, etc. Much is made of Moreschi's admission on cross examination as follows:

"Q. Now, Mr. Moreschi, you have taken an oath here. Can you positively swear if you were to meet your God that Mr. Cerce is the man that you saw in that bedroom that night? A. Under the circumstances, sir, I cannot be positive. Could you?"

The lack of certain evidence usually adduced in prosecutions for homicide will not detract from the State's case if it is otherwise sufficient to support a conviction. Furthermore, the fact that Moreschi was not "positive" does not invalidate his testimony in its entirety. An identification can be absolute or qualified, and if it is limited, that circumstance, taken into account with the remaining evidence, will determine whether or not there is sufficient proof to constitute a fact question to be decided by a jury. *People v. Robarge,* 255 *P.* 2d 877 (*D. Ct. App.*), reversed on other grounds, 41 *Cal.* 2d 628, 262 *P.* 2d 14 (*Sup. Ct.* 1953); *People v. Waller,* 14 *Cal.* 2d 693, 96 *P.* 2d 344 (*Sup. Ct.* 1939). See *State v. Landeros,* 20 *N. J.* 76 (1955); *People v. Spinello,* 303 *N. Y.* 193, 101 *N. E.* 2d 457 (*Ct. App.* 1951); *People v. Robarge,* 111 *Cal. App.* 2d 87, 244 *P.* 2d 407 (*D. Ct. App.* 1952).

Here, Moreschi on direct examination, in a police line-up and in the magistrate's court had already identified the accused as the man he had seen in the bedroom. The identification on these occasions was positive and unqualified. The modification brought about by the cross-examination might conceivably have strengthened the credibility of the witness' testimony in the view of the jury because of his apparent honesty and truthfulness. To the contrary, the jury also had a right to brand Moreschi's identification totally incredible and to discount it entirely. Even if it so concluded, there was other evidence amply proving the defendant's guilt of the crime charged against him.

There was an abundance of testimony that the accused was in the vicinity of his home immediately prior to the

time the killing occurred. When the police arrived at Cerce's residence after the event, both the front and rear doors were locked. The front door had an inside latch which, when on, barred the opening of the door by a key from the outside. The rear door, from either side, could only be locked by a key. Obviously, this door was locked by a key after the killing. The accused and his wife each had door keys, and, so far as the testimony reveals, no one else had keys to the house. Door keys were found in a woman's handbag in the bedroom and similar keys were found in the possession of the accused when he was taken into custody.

The air conditioner was in operation, and there was a dim light in the bedroom when the crime was committed. The air conditioner and the light were turned off when the police arrived. The defendant's bathrobe and laundered shirts placed on the bed after Moreschi's occupancy suggested Cerce's presence in the house. After fleeing, Moreschi saw a Cadillac car, the driver of which he could not identify because of the darkness, circle the block several times and slow down in front of the house as if in search of him. Admittedly, the accused had a Cadillac. The trail of .32 calibre bullets from the dressing room into the hall indicates some one familiar with the house removed a gun and ammunition from the desk and while greatly agitated tried to load it.

All these events and the legitimate inferences to be drawn therefrom point convincingly and unerringly to Cerce as the killer. He had both opportunity and motive. Who else would have brought to the scene an unloaded gun and ammunition? Who else but the householder would put two shirts and a bathrobe out and take care, when leaving, to turn off the lights and the air conditioner and to lock the back door? Who else had a key so these things could be done? Who else wanted to kill and why?

Additionally, Cerce's reaction when informed that his wife had been killed indicates not only knowledge of the crime but indifference to its results consistent with the position of a husband smarting under an outright betrayal.

Under normal circumstances, the receipt of such startling information, if unexpected, noticeably registers emotional disturbances difficult to control. The apathetic and indifferent behavior here permits an inference not at all favorable to the defendant. See *State v. Crivelli,* 89 *N. J. L.* 259, 261 (*E. & A.* 1916).

Highly significant also is the fact that when the two officers with drawn revolvers entered his apartment in Belmar, Cerce's only inquiry was: "Can I finish shaving?" He asked no questions about the presence of the police or the reason for his being placed under arrest. That knowledge was already his.

The failure of the defendant to take the stand is also to be considered. Where the prosecution's evidence is wholly circumstantial "the jury may not infer from the silence of the accused that he cannot deny the ultimate fact in issue —his guilt of the crime charged; the area of permissible inference from his silence is in such cases confined only to facts within his knowledge which, if true, would tend to establish his guilt. The jury may properly infer from the defendant's silence that the facts from which an inference of guilt may be drawn cannot be denied by him." *State v. Rogers,* 19 *N. J.* 218, 236 (1955). Thus, defendant's refusal to testify materially strengthens the foundation laid by the State.

The prosecution, in a circumstantial case, is entitled to the benefit of all legitimate inferences reflected by the evidence. Each fact is not to be isolated from the other circumstances proven but is to be weighed as it is associated with or relates to the other relevant proof proffered by the State. *State v. Rogers, supra; State v. Rhams,* 14 *N. J.* 282 (1954); *State v. Donohue,* 2 *N. J.* 381 (1949).

The full import of all of the testimony and the logical inferences to be drawn therefrom impress us with an abiding conviction to a moral certainty of the defendant's guilt, corroborating the verdict returned by the jury.

The test on a motion of a defendant for judgment of acquittal is whether there was any legal evidence before

the jury from which an inference of guilt could legitimately be drawn. *State v. Rogers, supra; State v. Picciotti,* 12 *N. J.* 205 (1953); *State v. Bricker, Jr.,* 99 *N. J. L.* 521 (*E. & A.* 1924); *State v. Fox,* 12 *N. J. Super.* 132 (*App. Div.* 1951). Here, the trial judge properly submitted the issue of guilt to the jury, and there is no evidence of mistake, passion, prejudice or partiality requiring a reversal, nor was there any indication of an injustice on the basis of fundamental fairness requiring correction. *State v. Landeros,* 20 *N. J.* 69 (1955).

█ It is next contended there was error in the refusal of the trial judge to admit testimony by an undertaker who buried the victim as to the arrangements made with the husband. It was offered upon the theory that it showed Cerce's love for his wife and rebutted the indifference to her fate emphasized by the prosecution.

The ruling was in conformity with *State v. Leo,* 80 *N. J. L.* 21 (*Sup. Ct.* 1910), and we conceive no reason to change the rule there enunciated. Such evidence, created after the crime, gives too much opportunity for contrivance to warrant admission and definitely falls within the prohibition against self-serving declarations.

█ Next it is said the prosecutor so far transgressed the limits of fair play in his summation as to have deprived the defendant of a fair trial.

A public prosecutor must not only be zealous in enforcing the law, but he must also consistently refrain from any conduct that is lacking in the essentials of fair play. Where his conduct crosses the line and results in foul play, we have not hesitated to reverse the decision below and remand it for a new trial. *State v. D'Ippolito,* 19 *N. J.* 540, 550 (1955). See also *State v. Siciliano,* 21 *N. J.* 249 (1956); *State v. Orecchio,* 16 *N. J.* 125 (1954); *State v. Ferrell,* 29 *N. J. Super.* 183 (*App. Div.* 1954).

We have made a thorough and complete appraisal of the prosecutor's remarks complained of, and we find none within the category calling for censure or requiring the reversal of the judgment.

■ As to the failure of the court to charge as requested, a reading of the entire charge shows the substance of these requests was covered in the general charge made, and, under the well-settled rule that the court is not required to charge in the precise language requested where the subject matter of the request is correctly and fully covered, we see no error. *State v. Rogers, supra; State v. Rios,* 17 *N. J.* 572 (1955); *State v. Tansimore,* 3 *N. J.* 516 (1950).

Lastly, the defendant insists there was error in the refusal of the trial court to grant a motion for a new trial. The reasons relied upon are the same as those already advanced and disposed of under other phases of this litigation.

A complete and full examination of the entire record reveals no manifest wrong or injury to the defendant. On the contrary, it bespeaks a fair trial with proper and adequate protection. His constitutional rights and privileges were fully preserved.

The judgment of conviction below is affirmed.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.