Filed 7/21/16  P. v. Cantrell CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E064076 |
| v. | (Super.Ct.No. RIF1402281) |
| DONNIE LUCKY CANTRELL et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  David A. Gunn, Judge. Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Cantrell.

Barbara S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant Wicker.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randall D. Einhorn, and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

# INTRODUCTION[1]

Donnie Lucky Cantrell and his girlfriend, Catherine Wicker, threatened their neighbor who had cooperated with the investigation of a criminal case against Cantrell. A jury convicted defendants on three counts of threatening and intimidating a witness[2] The trial court sentenced Cantrell to 13 years in prison[3] and granted Wicker formal probation for three years.

On appeal, defendants argue the trial court should have granted a mistrial after an investigating officer testified he had contacted Cantrell's parole officer at one point. Defendant Cantrell also contends that section 654 required a stay of his sentences on counts 1 (making a criminal threat) and 3 (threatening a witness), which were concurrent to his 13-year sentence on count 2 (intimidating a witness), because his offenses were based on a single course of conduct which had the same criminal purpose: to dissuade

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Both defendants were convicted of making criminal threats (§ 422; count 1); intimidating a witness or victim by using force and threatening to use force or violence (§ 136.1, subd. (c)(l); count 2); and threatening a witness or victim (§ 140, subd. (a); count 3). The jury also found true that Cantrell committed the charged felonies while released from custody (§ 12022.1), had a strike prior (§§ 459, 667, subds. (c) and (e)(l)), and 1170.12, subd. (c)(l)), served a prior prison term (§ 667.5, subd. (b)), and had a prior serious felony. (§ 667, subd. (a)). In a bifurcated proceeding, Cantrell admitted the prior strike, prison prior, and prior serious felony.

[3] The trial court sentenced Cantrell as follows: as to count 2, the midterm of three years doubled to six years by the strike prior, plus five years for the prison prior and two years for the out-on-bail enhancement for a total of 13 years; as to count 1, a concurrent midterm of two years; and as to count 3, a concurrent midterm of three years.

the victim from providing information to investigators about Cantrell's pending criminal case.

We reject defendants' contentions and affirm the judgment.

II

STATEMENT OF FACTS

Sergio Rodriguez, the victim, testified that he has used crutches his whole life because he had contracted polio as a child, causing atrophy of his left leg, and a car accident had damaged his hip when he was seven years old. Rodriguez and defendants were neighbors in San Jacinto but they were not friendly.

*A. Previous Events*

In September 2013, Mark Magill, an investigator with the Riverside County District Attorney's Office, contacted Rodriguez about being a potential trial witness in a criminal case against Cantrell.

Another time Magill tried to interview Cantrell, whom Magill believed was living at Wicker's residence. When Magill arrived at the residence, Cantrell evaded him. Magill asked Rodriguez to call him if he saw Cantrell. A few minutes later, Rodriguez reported that Wicker and Cantrell were leaving in a blue van. Magill went to Wicker's residence and encountered Wicker driving a blue van towards Magill's car with a man in the front passenger seat. The blue van swerved, accelerated and departed.

*B. Jailhouse Calls*

In December 2013 and January 2014, Magill monitored about 20 hours of Cantrell's jailhouse calls, mostly with Wicker, concerning Rodriguez being a witness.

3

During the calls, Cantrell and Wicker referred to Rodriguez many times using the term "snitch," as well as other pejorative terms. Magill counseled Rodriguez to call him or 911 if there were any problems when Cantrell moved back in with Wicker.

C. *June 5, 2014*

On June 5, 2014, Magill called Rodriguez to check on him. At noon, Rodriguez was in his garage preparing lawn fertilizer. Wicker was driving her white car with Cantrell in the front passenger seat when she backed up and stopped in front of Rodriguez's driveway. Cantrell rolled down the window and told Rodriguez to mind his own business and called him a "snitch ass n----." Wicker added, "F--- snitches." Cantrell told Rodriguez that he would not wake up the next day if he continued to snitch. Wicker said, "That's on 30's, you won't wake up," which Rodriguez understood to be a gang reference.

Rodriguez felt vulnerable because he realized defendants were mad at him for speaking with the police and trying to prevent him from testifying. Rodriguez feared for his life and thought that he could possibly be shot, injured, or attacked. He warned defendants he would call the police if they did not leave. Eventually, defendants drove away and Rodriguez thought the interaction was over.

After Rodriguez finished mixing fertilizer, he fertilized the grass with a spreader while using crutches. A few minutes later, Wicker's car reappeared and pulled into the driveway of Rodriguez's residence. Rodriguez was standing in the middle of his lawn, on crutches and holding the fertilizer spreader. Wicker and Cantrell left the car and approached within eight feet of Rodriguez. Cantrell clenched a fist and took a fighting

4

stance. Wicker and Cantrell directed more profanities at Rodriguez and warned he was going to get what was coming to him.

Rodriguez told Wicker to shut up. Although Rodriguez claimed he was going to call Cantrell's parole officer, he was bluffing because he did not have the parole officer's phone number. Cantrell continued to yell and curse at Rodriguez. Wicker said that she was not on parole and she could act however she wanted. Wicker repeated, "[i]t's on 30's," that Rodriguez "would not wake up," was "done," and that "snitches get what they get." Wicker also called Rodriguez a "faggot." Cantrell repeated his earlier verbal attacks.

Rodriguez was afraid his life was in danger. It was difficult for him to maneuver with crutches on the grass, and he could not defend himself if defendants attacked him. After Rodriguez said he was going to call the police, defendants walked away.

Another neighbor, Heather Tapia, was working in her home office. She overheard an argument between Rodriguez and two people who were occupants in Wicker's car. Tapia did not identify defendants as the occupants.

Rodriguez called Investigator Magill and they arranged to meet after Rodriguez purchased a video camera surveillance system. Rodriguez already had a basic house alarm system He purchased an eight-camera system with audio and installed four cameras that day. When Magill spoke with Rodriguez, he was still fearful of Cantrell, whom he described as having facial and neck tattoos. Rodriguez later installed three more cameras for protection. Magill and another investigator detained Wicker and arrested her.

5

*D. The Defense*

Cantrell did not testify in his own defense. Wicker testified she was 50 years old and the caretaker of two disabled children, ages 17 and 23. Cantrell, her boyfriend, was much younger with tattoos on his neck and arms. Wicker and Cantrell have been in a relationship since 2012.

On the morning of June 5, 2014, when Wicker backed her car out of the driveway, Rodriguez hollered, "Hey, cougar" and "Now, you want to get with Papi?" When Rodriguez had previously made similar comments to her, she would respond that he was married and she was not interested in him. Rodriguez said, "F you, you old bitch." Wicker kept driving because Rodriguez had "disrespected" her.

Wicker testified that she went to the pharmacy to pick up prescription medicine and drop off her female cousin who was in the car. When she returned, Rodriguez hollered, "Bitch." Wicker displayed her middle finger to Rodriguez, exited her car, and went inside her house.

Regarding the jail telephone calls monitored by Magill, Wicker claimed her statements about being angry at the "mother fucker across the street" and cussing him out were about another person, the brother of a woman with whom Cantrell was having an affair. Wicker testified that the woman's family was harassing her.

Wicker denied that Cantrell was at her residence on June 5, 2014. Wicker denied ever threatening Rodriguez or calling him a snitch although she told Rodriguez, "Your mother's a bitch."

6

Wicker claimed that she had not previously met Magill, and that the officers did not identify themselves before pulling her out of the white car although she was telling them to stop, and she screamed and honked her horn in hopes that neighbors might assist her. Wicker denied screaming, "Donnie, get out of here." Wicker claimed one investigator kneed her in the back and the other investigator held her head down on the lawn. Wicker complained she could not breathe. She was handcuffed and advised she was being arrested for threatening a witness. A video of the arrest was played for the jury during Wicker's testimony.

*E. Rebuttal*

Investigator Magill testified he had previously met Wicker in October of 2013. On June 5, 2104, he saw Wicker when she exited the driver's side of her car. Magill testified how the video depicts him calling out Wicker's name and stating he needed to speak with her. Wicker kept repeating, "No, no, no." Wicker started the car, honked the horn and was yelling, "Donnie." When the officer turned off the ignition, Wicker turned it back on, continuing to honk the horn and yell, "Donnie."

Magill searched the backseat of Wicker's car and found a duffel bag, containing men's clothing and several letters addressed to Cantrell, listing Wicker's residence and her name as the return address. Cantrell was not present inside the residence.

III

MISTRIAL MOTION

Rodriguez testified that he tried to bluff defendants by threatening to call Cantrell's parole officer. During Magill's testimony, he explained that after speaking

7

with Rodriguez on June 5, 2014, he made "contact with Mr. Cantrell's parole agent to inform him of what was going on." Cantrell's counsel moved for a mistrial, arguing that Magill's testimony confirmed Cantrell's parolee status and went beyond showing why Rodriguez was afraid of Cantrell and had threatened to call his parole agent. Wicker's counsel joined, adding that Cantrell's parolee status tainted her defense. The trial court observed the prosecutor had been careful and it was not relevant to the charged crimes that Magill contacted Cantrell's parole agent. The trial court characterized Magill's reference to Cantrell's parole as "minor prejudice quite honestly" and stated that, later that day, it would admonish the jurors to consider the parole reference only for the limited purpose of how it related to Rodriguez's fear of Cantrell.

The trial court admonished the jury: "All right. We're back in session. . . . [¶] Our witness is still on the stand. [¶] There was an objection to an earlier question, folks, and that objection is sustained. That is that any information regarding Mr. Cantrell's parole status, you're to disregard that and not consider that for any fashion other than for the limited purpose in which you received it earlier which was for the testimony of Mr. Rodriguez. [¶] And, again, the limited purpose of that evidence as it relates to Mr. Rodriguez is how it affected him, in other words, how it affected his actions, or how it may have played a part in the fear that he may have felt, his belief that Mr. Cantrell was on parole; other than that his parole status is not to be considered by you in any way, shape, or form."

Defendants contend the trial court abused its discretion by denying their mistrial motion because Magill's testimony was irrelevant, inadmissible and highly inflammatory.

8

However, the passing mention of parole by Rodriguez and Magill does not mean the jury was actually informed that Cantrell had been convicted of a felony or had spent time in prison. We conclude the trial court properly denied the mistrial motion because prejudice, if any, from Magill's testimony was curable by the trial court's admonition and instruction to the jury. (*People v. Williams* (1981) 115 Cal.App.3d 446, 453.)

The trial court was well within its discretion to conclude that Magill's statement was not so prejudicial as to require a mistrial: "'"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when "'"a [defendant's] chances of receiving a fair trial have been irreparably damaged."'" (*People v. Collins* (2010) 49 Cal.4th 175, 198.)" (*People v. Edwards* (2013) 57 Cal.4th 658, 703.) The trial court evaluates the prejudice factually. (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.) The appellate court reviews the trial court's ruling denying a mistrial motion for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 575; *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.)

Although Magill's testimony lacked relevance and was inadmissible, the issue is whether admonishing and instructing the jury was adequate: "Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction." (*People v. Navarrete, supra,* 181 Cal.App.4th at p. 834.)

9

In *Navarrete*, a detective willfully and in bad faith volunteered that the defendant had confessed to the charged crime, committing a lewd act upon a child. The appellate court found striking the testimony and admonishing the jury to disregard it was inadequate because "[a] jury's belief that a defendant may have confessed eviscerates the presumption of innocence" (*People v. Navarrete, supra,* 181 Cal.App.4th at p. 834) and "even a single reference to an inadmissible confession can be the sort of 'exceptional circumstance' that supports granting a mistrial because a curative instruction cannot undo the prejudice to the defendant." (*Id.* at p. 836.)

In other cases, courts have held improperly admitted evidence necessitates a mistrial where the evidence in the case is close, or where the improper evidence was admitted as the result of misconduct. (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 [reference to defendant's parole status incurable]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339-342 [statement that defendant was an ex-convict was incurable by admonition]; *People v. Figueiredo* (1955) 130 Cal.App.2d 498, 505-506 [prosecutor intentionally elicited testimony that defendant had "done time" in San Quentin].)

In contrast, curative instructions have been sufficient to dispel prejudice when the evidence in question was brief and isolated, or trivial in comparison with the other evidence in the case (*People v. Edwards, supra,* 57 Cal.4th at pp. 702-704; was oblique or ambiguous (*People v. Lightsey* (2012) 54 Cal.4th 668, 717-719 [vague references to "Wasco" did not imply that defendant was imprisoned]; *People v. Elliott, supra*, 53 Cal.4th at pp. 574-576; *People v. Bolden* (2002) 29 Cal.4th 515, 554-555 [fleeting

10

reference to a parole office did not denote the defendant had a prior felony]; or was duplicative of other, properly admitted evidence. (*Edwards,* at p. 703.)

The California Supreme Court's decision in *Bolden* supports the trial court's denial of the mistrial motion in this case. At trial in a murder case, the prosecutor asked a police officer a question about the defendant's address, and the officer answered, "It was at the Department of Corrections parole office located at--." (*People v. Bolden, supra*, 29 Cal.4th at p. 554.) The prosecutor interrupted the officer's testimony and redirected him to the question he had asked. The defense moved for a mistrial on the ground the officer's testimony implied defendant had suffered a prior felony conviction and served a prison sentence. The trial court found there was insufficient prejudice to warrant a mistrial because the brief reference to the parole officer was unlikely to make a lasting impression on the jury. (*Id.* at pp. 554-555.) The Supreme Court held the trial court did not abuse its discretion.

Similarly here, Magill briefly answered a question in a manner that allowed the jury to learn that Cantrell was on parole. The trial court properly observed that "the jurors have already heard that Mr. Rodriguez believed that Mr. Cantrell was on parole." Magill's reference to contacting Cantrell's parole officer resulted in only "minor prejudice" and showed no bad faith. Any minor prejudice could be cured by an admonition or instruction. The trial court promptly took steps to cure any potential prejudice by instructing the jury to disregard Magill's testimony. "'A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that "the improper

11

subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions."'" (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404, quoting *People v. Allen, supra,* 77 Cal.App.3d at pp. 934-935.) Accordingly, the trial court did not abuse it discretion in denying Cantrell's and Wicker's mistrial motion.

Furthermore, any error is harmless in light of the overwhelming evidence of defendants' guilt. (*People v. Dunn, supra,* 205 Cal.App.4th at p. 1100; *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) Rodriguez had ample reason to fear an attack by defendants. There was little reason to doubt that Cantrell was not present or did not issue threats. Rodriguez's testimony, as believed by the jury, was sufficient to support a conviction, unless that testimony was physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The determination of whether a defendant intended his or her words to be taken as a threat, and whether the words were sufficiently unequivocal to convey to the victim an immediacy of purpose, can be based on all the surrounding circumstances and the parties' history, and not just on the words alone. (*People v. Mosley* (2007) 155 Cal.App.4th 313, 324.) "Sustained" fear means a period of time that extends beyond what is momentary, fleeting or transitory. (*People v. Allen, supra,* 33 Cal.App.4th at p. 1156.) Rodriguez's testimony, and the totality of the circumstances surrounding his encounters with defendants showed ample sustained fear to support the convictions. Magill's incidental remark about Cantrell's parole status was harmless under any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24; *Allen,* at p. 935 [improper reference to a prior conviction is nonprejudicial in the light of a

12

record that points convincingly to guilt]; *People v. Harris, supra*, 22 Cal.App.4th at pp. 1580-1581.)

IV

SECTION 654

In sentencing Cantrell, the trial court made count 2 (intimidating a witness by force or violence) the principal term, and imposed a sentence of 13 years as follows:  six years based on the midterm of three years, doubled by a strike prior, an additional five years for the serious felony prior, and two years for the on-bail enhancement.  The court imposed concurrent midterms of two years on count 1 (making criminal threats) and three years on count 3 (threatening a witness).

Cantrell contends that section 654 required the punishment be stayed for counts 1 and 3 because the offenses occurred during a single course of conduct which had the same criminal purpose—to stop Rodriguez from providing information about Cantrell's alleged crimes.  We hold the trial court properly sentenced Cantrell to concurrent terms for counts 1 and 3 because, under the circumstances here, section 654 did not preclude punishment for criminal threats (count 1) and threatening a witness (count 3), in addition to the punishment for using force or threats (count 2).

Section 654 provides in relevant part:  "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  "[T]he purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability.

13

[Citations.] . . .' . . . A person who commits separate, factually distinct, crimes, even with only one ultimate intent and objective, is more culpable than the person who commits only one crime in pursuit of the same intent and objective.' [Citation.]" (*People v. Correa* (2012) 54 Cal.4th 331, 341.)

In other words, "[s]ection 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*People v. Jones* (2012) 54 Cal.4th 350, 358.) Multiple criminal objectives may "be a predicate for multiple punishment only in circumstances that involve, or arguably involve, multiple acts. The rule does not apply where . . . the multiple convictions at issue were indisputably based upon a single act." (*People v. Mesa* (2012) 54 Cal.4th 191, 199.)

For count 1, making a criminal threat (§ 422), the prosecutor was required to prove, based on CALCRIM No. 1300, that Cantrell "willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Sergio Rodriguez," that Cantrell "made the threat orally" and "intended that his . . . statement be understood as a threat." Also, the prosecutor was required to prove that the threat was "so clear, immediate, unconditional, and specific that it communicated to Sergio Rodriguez a serious intention and the immediate prospect that the threat would be carried out" and "actually caused Sergio Rodriguez to be in sustained fear for his own safety." Finally, the prosecutor was required to prove that Rodriguez's fear was reasonable under the circumstances.

For count 2, intimidating a witness (§ 136.1), the prosecutor was required to prove, based on CALCRIM Nos. 2622 and 2633, that: Cantrell (1) "maliciously tried to prevent or discourage Sergio Rodriguez from attending or giving testimony at a jury

14

trial;" (2) Rodriguez was a witness; (3) Cantrell knew he was "trying to prevent or discourage Sergio Rodriguez from providing testimony at a Jury Trial;" (4) Cantrell acted maliciously; and (5) Cantrell used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1343.)

For count 3, threatening a witness (§ 140), the prosecutor was required to prove, based on CALCRIM No. 2624, that "Sergio Rodriguez gave assistance or information to a law enforcement officer in a criminal case," and that Cantrell "willfully threatened to use force or violence against Sergio Rodriguez because he had given that assistance or information."

Count 3 is distinct from counts 1 and 2. Section 140, subdivision (a), defines threatening a witness or victim as including the willful use or threatened use of force against a victim of a crime because the victim provided assistance or information to a peace officer or public prosecutor. (*People v. Fernandez* (2003) 106 Cal.App.4th 943, 948.) Unlike criminal threats, "the acts proscribed in section 140 . . . take place *because* the witness, victim, or informant has provided information or assistance to a law enforcement officer. The statute is retrospective rather than prospective and proscribes acts which are retaliatory rather than acts to intimidate. It defines only a description of the particular act of threatening to use force or violence . . . without reference to an intent to do a further act or achieve a future consequence." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) Although a threat may involve both retaliation for past help to law enforcement and intimidation to prevent future help (*People v. Mendoza, supra*, 59

15

Cal.App.4th at pp. 1342-1345), dissuading a witness can involve a continuous course of conduct. (*People v. Salvato* (1991) 234 Cal.App.3d 872, 883.)

The prosecutor argued on count 1 (making a criminal threat) that defendants told Rodriguez several times that he was "not going to wake up tomorrow morning" if he continued to assist law enforcement. As to intimidating a witness (count 2), the prosecutor argued that defendants returned a second time, and Cantrell was in a fighting stance as he and Wicker screamed and threatened Rodriguez as he stood on his front lawn. For threatening a witness (count 3), the prosecutor argued that defendants did so because Rodriguez had already assisted law enforcement officers on a pending criminal case against Cantrell.

Cantrell compares himself to the defendant in *People v. Mendoza, supra*, 59 Cal.App.4th 1333—who made a single statement to a victim and was convicted of both dissuading a witness (§ 136.1) and criminal threats (§ 422)—where section 654 required a stay on the sentence for his conviction for criminal threats. (See *People v. Mesa, supra*, 54 Cal.4th at pp. 199-200.) The offenses here occurred on the same day but they were separate and distinct offenses with different intents and objectives.

The offense of threatening a witness involved a continuing course of conduct in which defendants repeatedly called Rodriguez a "snitch" who was going to suffer for his past cooperation with law enforcement. The offense of witness intimidation involved defendants returning and confronting Rodriguez on his lawn. Cantrell clenched his fist and assumed a fighting stance. Wicker repeated telling Rodriguez that he was "not going to wake up," was "done" and that "snitches get what they get." Cantrell also used

16

profanities.  Rodriguez felt vulnerable and endangered.  The criminal threats offense involved defendants' threat about future cooperation with law enforcement.

Under these circumstances, section 654 does not prohibit a concurrent sentence for making a criminal threat, as charged in count 1, and a concurrent sentence for threatening a witness as charged in count 3, to the principal 13-year term for intimidating a witness as charged in count 2.

V

DISPOSITION

The trial court did not abuse its discretion by denying defendants' mistrial motion. Section 654 does not require a stay of Cantrell's concurrent sentences.  We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON          
J.

We concur:

HOLLENHORST          
Acting P. J.

SLOUGH          
J.

17